IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

GARY GILLARD,

                              Plaintiff,

                                                      Civ. Action No.
         v.                                           9:09-CV-0431 (TJM/DEP)

SCOTT HAMEL and PETER McNALLY,

                              Defendants.

_____

APPEARANCES:                             OF COUNSEL:

FOR PLAINTIFF:

GARY GILLARD, *Pro Se*
01-A-1613
Southport Correctional Facility
P.O. 2000
Pine City, NY 14871

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        MICHAEL G. McCARTIN, ESQ.
Attorney General                 Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Gary Gillard, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983, alleging that he was deprived of his civil rights by the defendants during the period of his confinement.  As a result of prior court decisions, the sole remaining claims in the action are asserted against two corrections officers employed at the prison facility in which plaintiff was housed at the relevant times, and stem from an incident in which defendants allegedly encouraged a fellow inmate to attack Gillard, failed to protect him from the inmate's assault, and then applied excessive force in subduing him. Plaintiff's complaint seeks both monetary damages and injunctive relief, including a directive that he be transferred to another prison facility.[1]

Currently pending before the court is an application by the remaining

_____

[1]        A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir.1983).  It is well settled in this circuit that transfer from a prison facility moots an action for injunctive relief involving the transferring facility. *Prins v. Coughlin*, 76 F.3d 504, 506 (2nd Cir. 1996) (citing *Young v. Coughlin*, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989), and *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986)); *Candelaria v. Greifinger*, No. 96-CV-0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).  In this case, plaintiff's request for a transfer has been rendered moot by virtue of the fact that he is now confined in a correctional facility other than the one at which the relevant events occurred.

two defendants seeking the entry of summary judgment dismissing plaintiff's remaining claims, both on merits and on the basis of qualified immunity.  For the reasons set forth below, I recommend that defendants' motion be granted.

I.    BACKGROUND[2]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Corrections and Community Services ("DOCCS").  *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 56-6) ¶ 1.[3]  At the time the relevant events in this action occurred plaintiff was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.  Complaint (Dkt. No. 1) Preliminary Statement.

While as originally constituted plaintiff's complaint in this action broadly alleged the existence of an ongoing conspiracy and that he was continuously harassed by prison officials at Great Meadow, his claims

_____

[2]      In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]      As will be seen, by his failure to properly oppose defendants' motion, plaintiff is deemed to have admitted the allegations of fact set forth in Defendants' Local Rule 7.1(a)(3) Statement.  *See* pp. 7-9, *post*.

3

have been winnowed significantly, and now center upon an incident

occurring at that facility on March 13, 2009.  On that date, according to the

plaintiff, Corrections Officer Hamel directed another inmate to attack him

and then stood by during the incident, refusing to stop the ensuing fight,

and later utilizing excessive force against the plaintiff until the encounter

had ended.  Complaint (Dkt. No. 1) ¶ 30; Defendants' Local Rule

7.1.(a)(3) Statement (Dkt. No. 56-6) ¶ 3.  Plaintiff alleges that defendant

Hamel placed his knee into Gillard's kidney and lower back area, and

placed his forearm on Gillard's neck while in the process of placing

restraints on his wrists, and additionally placed his knee on plaintiff's neck

area "with all of his weight."  Complaint (Dkt. No. 1) ¶ 30.  Plaintiff alleges

that defendant Hamel's actions caused aggravation of his pre-existing

cervical and lumbar back spine injuries.  *Id.* at ¶¶ 30, 32.

As a result of the incident plaintiff was issued a misbehavior report

accusing him of violent conduct and fighting.  *See* McCartin Decl. (Dkt.

No. 56-2) Exh. B.  The issuance of that misbehavior report was based

upon an investigation which, according to prison officials, revealed that

Gillard was the aggressor and initiated the fight with his fellow inmate.

*See id.*  That misbehavior report led to the convening of a Tier II hearing,

4

in which plaintiff refused to participate, and a subsequent finding of guilt

with a corresponding sentence which included a thirty-day period of

disciplinary keeplock confinement and a corresponding loss of package,

commissary, and telephone privileges.  *See* McCartin Decl. (Dkt. No. 56-

2) Exh. B.

II.    PROCEDURAL HISTORY

        Plaintiff commenced this action on April 13, 2009.  Dkt. No. 1.  In his

complaint Gillard named several defendants, including David Rock, the

Superintendent at Great Meadow; Corrections Counselor Howard

Osborne; Corrections Sergeants Michael Hoy and Matthew Sabo;

Corrections Officers Michael Rovelli, Scott Hamel, Alfred Aubin, Peter

McNally, Smith, and Ronald Lamb; Bruce Porter, a Maintenance Assistant

at the facility; and two John Doe defendants.  *See id.*  Although those

claims were not stated as discrete causes of action, plaintiff's complaint

asserted that the defendants have 1) violated his right to due process; 2)

denied him the right to correspond with those outside of the facility; 3)

denied him access to the courts; 4) unlawfully tampered with his incoming

and outgoing mail; 5) subjected him to cruel and unusual punishment

through the use of excessive force and the denial of power, television, and

radio without due process; 6) issued him false misbehavior reports; and, 7) breached their duty to protect him from harm. *See generally* Plaintiff's Complaint (Dkt. No.1).

Following service of process all of the named defendants, with the exception of Scott Hamel and Peter McNalley, filed a pre-answer motion seeking dismissal of plaintiff's complaint for failure to state a claim upon which relief may be granted.  Dkt. No. 27.  That motion resulted in my issuance on August 30, 2010 of a report recommending that defendants' motion be granted and that all claims in the action except those against defendants Hamel and McNally be dismissed, with leave to replead.  Dkt. No. 52.  That report and recommendation was adopted by Senior District Judge Thomas J. McAvoy on December 13, 2010.  Dkt. No. 54.  Despite being granted leave to replead, plaintiff has not filed an amended complaint in the action.

On June 7, 2011, following the completion of discovery which included the taking of plaintiff's deposition, the remaining two defendants moved for the entry of summary judgment dismissing plaintiff's remaining

claims.[4]  Dkt. No. 56.  In their motion defendants argue that any force alleged to have been applied against the plaintiff did not rise to a level of constitutional significance and that his excessive force claim is therefore subject to dismissal, additionally asserting their entitlement to qualified immunity from suit.  *See generally id.*  Plaintiff has since responded in opposition to defendants' motion.  Dkt. No. 61.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Plaintiff's Failure to Submit a Local Rule 7.1(a)(3) Statement

Among the materials submitted by the defendants in support of their motion is a statement of material facts which, they contend, are not in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). In his opposition papers, plaintiff has failed to address that statement. Before turning to the merits of defendants' motion the court must first

---

[4]     Plaintiff's deposition began on a sour note, with plaintiff refusing to answer questions posed by defendants' counsel concerning his criminal history and quarreling over the refusal.  *See* McCartin Decl. (Dkt. No. 56-2) Exhs. A at pp. 9-14/95.

7

address the significance, if any, of this failure.

By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have consistently enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[5]

In this instance, the plaintiff was pointedly warned of the consequences of failing to properly respond to defendants' motion. In their notice of motion, defendants specifically advised Gillard of the requirements of Local Rule 7.1(a)(3), noting that "[i]n the absence of such a statement [responding to Defendants' Local Rule 7.1(a)(3) Statement],

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

all material facts set forth in defendants' statement of material facts will be

deemed to be admitted by the Court."  *See* Notice of Motion (Dkt. No. 56)

at p. 2.  In addition, the court's form notice to *pro se* plaintiffs of the

consequences of failing to respond properly to a summary judgment

motion, which was attached to plaintiff's notice of motion, advises in

relevant part that

> [i]f you do not submit a short and concise statement of
> material facts as to which you claim there are genuine issues
> in dispute, all material facts set forth in the statement filed and
> served by the defendant(s) shall be deemed admitted.

*See* Notification of Consequences (Dkt. No. 56-1).  In light of these

admonitions and plaintiff's failure to provide a Local Rule 7.1(a)(3)

Statement, I recommend that the court deem him to have admitted each

of the statements of fact set forth in Defendants' Local Rule 7.1(a)(3)

Statement.[6]

### B.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

---

[6]      As to those facts not contained in the Defendants' Local Rule 7.1(a)(3)
Statement, I assume for purposes of this motion that plaintiff's version of those facts is
true, since plaintiff is entitled to the benefit of all inferences at this stage.  *Wright v.
Coughlin,* 132 F.3d 133, 137 (2d Cir. 1998).

warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In

10

the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting an obligation of court to consider whether *pro se* plaintiff understood the nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

    C.    <u>Merits of Plaintiff's Claims</u>

        1.    <u>Defendant Hamel</u>

Plaintiff's claims against defendant Hamel appear to have two components.  The first alleges that he directed a fellow inmate to attack the plaintiff and then stood idly by, failing to protect him during the course of the ensuing fight.  Plaintiff further asserts that after the fight Corrections Officer Hamel applied excessive force, twisting his wrists, placing his knee onto his neck, and rubbing his face on the ground during the course of placing his hands in restraints.

        a.    <u>Excessive Force</u>

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which outlaws punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth

12

Amendment does not mandate comfortable prisons, neither does it

tolerate inhumane treatment of those in confinement; it is against this

backdrop that the conditions of an inmate's confinement are subject to

Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114

S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349,

101 S. Ct. 2392, 2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment

is violated by an "unnecessary and wanton infliction of pain."  *Whitley,* 475

U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen*

*v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  When an inmate alleges the

use of excessive force by a corrections employee the lynchpin inquiry is

"whether force was applied in a good-faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing

harm."  *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999

(1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S.

at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028,

1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414

U.S. 1033, 94 S. Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both

13

objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct.  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  As was emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial.  130 S. Ct. 1175, 1179 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . . This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see Romaine v.*

14

*Rewson,* 140 F. Supp.2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112 S. Ct. 1000 (citations omitted).

   With its focus on the harm done, the objective prong of the inquiry is case specific and relies upon "contemporary standards of decency."  *Wright*, 554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000) (internal quotations omitted)).  When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff.  While the absence of significant injury is certainly relevant, it is not dispositive.  *Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force.  *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards

of decency are always violated . . . .  This is true whether or not significant injury is evident.'"  *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").  Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate.  *Wrigh*t, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

During his deposition plaintiff testified that while he and a fellow inmate were on the ground fighting, defendant Hamel and other officers attempted to end the altercation.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 56-6) ¶ 5; McCartin Decl. (Dkt. No. 56-2) Exh. 1 at p. 29.  During that endeavor defendant Hamel took plaintiff's hands, twisted his wrists, and placed his knee on his neck.  McCartin Decl. (Dkt. No. 56-2) Exh. 1 at p. 29.  At no time did Corrections Officer Hamel punch, kick or throw Gillard into the wall.  *Id.* at p. 32.  While plaintiff claims that his neck was injured as a result of the actions, he also admitted having had a previous serious neck injury.  *Id.* at p. 71.

The application of the Eighth Amendment's cruel and unusual punishment provision to claims of excessive force is extremely fact specific.  *Dukes v. Troy Housing Auth.*, No. 1:08–CV–479, 2011 WL 1261317, at *7 (N.D.N.Y. Mar. 31, 2011) (Scullin, S.J.).  The question ultimately revolves around the need for force to maintain and restore discipline and the extent of force utilized.  In this case, it is clear that corrections officers, including defendant Hamel, were faced with situation of two inmates fighting and the need to restore discipline and to apply the amount of necessary force to accomplish that end.  While plaintiff alleges

17

their use of force, there is no indication that he received any serious injury as a result of their actions, nor does it appear from his complaint that the force utilized was excessive given the situation presented.  Simply stated, the force which plaintiff claims was applied was *de minimis,* in light of the circumstances, and insufficient to implicate the protections of the Eighth Amendment against cruel and unusual punishment.  *See Smith v. City of New York*, No. 04 Civ. 3286, 2010 WL 3397683, at * 11 (S.D.N.Y. 2010) (granting summary judgment as to excessive force claim finding "it does not appear from plaintiff's own testimony that the handcuffs were unreasonably tight, and plaintiff's injuries were clearly *de minimis*."); *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997) (claim that inmate was bumped, grabbed, elbowed, and pushed by two officers "not sufficiently serious or harmful" to meet objective element); *Brown v. Busch*, 954 F. Supp. 588, 595-96 (W.D.N.Y.1997) (two officers pushed inmate into cell, causing small superficial abrasion on inmate's back; amount of force used was "clearly *de minimis* "); *Maguire v. Coughlin*, 901 F. Supp. 101, 104 (N.D.N.Y.1995) (summary judgment granted dismissing inmate's claim that he was "physically manhandled" during prison transfer; court found no evidence "that the defendants used more than *de minimus*

18

[sic] force against plaintiff, or that their use of de *minimus* [sic] force was repugnant to the conscience of mankind.").

      b.    <u>Failure to Protect</u>

Undeniably, prison officials have a responsibility to provide a safe environment for prisoners, and an inmate can establish an Eighth Amendment violation by showing that he or she "incarcerated under conditions posing a substantial risk of serious harm and that prison official's acted with "deliberate indifference" to the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994). A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). When examining a failure to protect claim under the Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Matthews*, 36 F. Supp. 2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.).

As can be seen, this analysis entails both an objective and subjective inquiry.

In objective terms, a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it denied him or her the "minimal civilized measure of life's necessities." *Dawes v. Walker*, 239 F.3d 489, 493-94 (2nd Cir. 2001) (internal quotations and citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002). Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Dawes*, 239 F.3d at 493; *Matthews*, 36 F. Supp. 2d at 124-25.

To demonstrate that defendants were deliberately indifferent to his or her plight, a plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his or her health and safety – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Matthews*, 36 F. Supp. 2d at 124-25.

In this instance, plaintiff's deposition testimony is clear and unequivocal.  Prior to the fight, he did not feel that he needed protective custody from any other inmate.  *See* McCartin Decl. (Dkt. No. 56-2) Exh. 1 at p. 37.  By his own admission, during the fight the other inmate never even made contact with plaintiff, but instead failed at two attempts to punch Gillard.  *Id.*  With the other inmate's third effort to swing at him, Gillard grabbed his attacker, tripped him, and brought him down to the floor.  *Id.*   As plaintiff readily acknowledged at his deposition, he suffered no harm as a result of the fight with his fellow inmate.  *See* McCartin Decl. (Dkt. No. 56-2) Exh. 1 at p. 37.

Objectively, plaintiff's testimony itself effectively precludes a finding that he was exposed to conditions posing a substantial risk to his safety. Plaintiff's speculation that defendant Hamel directed the other inmate to attack Gillard is unsupported by the record, and contradicted by denials of both Hamel and the inmate involved.  *See* Plaintiff's Motion Response (Dkt. No. 61) pp. 26/40 and 29/40.  Even when crediting plaintiff's version of the events that transpired, it is clear that before the fight there was no reason to believe that his well-being was in jeopardy, and during the fight plaintiff maintained the upper hand.  Additionally, both plaintiff's testimony

21

and the conceded lack of an injury is contradictory to the notion that,

subjectively, when witnessing the altercation defendant Hamel became

aware of but disregarded a serious threat of harm to plaintiff.  In sum, the

record is devoid of any evidence upon which a reasonable factfinder could

conclude that defendant Hamel was aware of and disregarded an

excessive risk to plaintiff's safety.  Accordingly, I recommend dismissal of

this aspect of plaintiff's claim against defendant Hamel as well.[7]

        2.    Defendant McNally

Defendant McNally does not appear to have been involved in the

March 13, 2009 incident.  *See* Complaint (Dkt. No. 1) ¶ 30.  Plaintiff's

complaint alleges that two days later he was informed by another

---

[7]     Claims involving the alleged failure of prison officials to protect an inmate from harm are also subject to review under the Fourteenth Amendment's substantive due process provision.  Though the requisite mental state for establishing a Fourteenth Amendment failure to protect claim is somewhat unclear, it is at least apparent that to be legally cognizable under that provision, the actions alleged on the part of a defendant must transcend mere negligence.  *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986) (same); *Morales v. New York State Dep't of Corrs.*, 842 F.2d 27, 30 (2nd Cir. 1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *Abdul-Matiyn v. New York State Dept of Corr. Servs.*, 871 F. Supp. 1542, 1546-47 (N.D.N.Y. 1994) (Chin, J.) (citing Morales).  For the same reasons that plaintiff's failure to protect claim under the Eighth Amendment fails, any such claim brought under the Fourteenth Amendment cannot survive defendants' motion for summary judgment.

individual that Officer McNally told the inmate that Gillard had raped a seven year old girl, apparently intending that the inmate harm Gillard.  *Id.* ¶ 33.  This claim, which is both purely speculative and attenuated in nature, is insufficient to support a constitutional claim against defendant McNally.   *See McPherson v. N.Y. City Dep't of Educ*., 457 F.3d 211, 215 n. 4 (2d Cir. 2006) ("speculation alone is insufficient to defeat a motion for summary judgment"); *see also Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 90 (2d Cir. 2005) (holding that, in age discrimination case, allegations of defendant's knowledge of protected ground must be supported by evidence to avoid summary judgment); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 432–33, 469 (N.D.N.Y.2009) (plaintiff's contention that defendant Sobek was on the other end of a telephone conversation was a mere "guess" insufficient to defeat a grant of summary judgment with respect to a claim that defendants conspired to violate plaintiff's civil rights). Moreover, during his deposition plaintiff conceded that Corrections Officer McNally never physically harmed him and stated that while Officer McNally "[s]anctioned another inmate to attack [him]", he admitted that the alleged attack is not part of this lawsuit.  McCartin Decl. (Dkt. No. 56-2) Exh. 1 at pp. 53-55.  I therefore recommend dismissal of plaintiff's claims

23

against defendant McNally.

IV.   SUMMARY AND RECOMMENDATION

Plaintiff's remaining claims in this action against defendant McNally appear to be nebulous, at best, and by plaintiff's own admission are not central to this action.  Based upon the record now before the court I conclude that no reasonable factfinder could find a basis to hold defendant McNally accountable for violating plaintiff's civil rights.

Turning to plaintiff's claims against defendant Hamel, as a matter of law the record fails to support a claim of failure to protect the plaintiff from a known harm as well as his claim of the use of excessive force.  Simply stated, it appears that the force involved and any resulting injuries sustained by the plaintiff were *de minimis* and constitutionally insignificant, particularly given that at the relevant times Corrections Officer Hamel and his fellow officers were acting to restore discipline following an altercation between two inmates.[8]  Accordingly, it is hereby respectfully

---

[8]      In light of my recommendation on the merits I find it unnecessary to address defendants' alternative argument of entitlement to qualified immunity.  *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S. Ct. 2151 (2001); *Harhay v. Town of Ellington Bd. Of Ed.*, 323 F.2d 206, 211 (2d Cir. 2003); *Warren v. Town of Ellington Bd. Of Ed.,* 323 F.3d 206, 211 (2d Cir. 2003); *Warren V. Keane,* 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)).

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 56) be GRANTED, and plaintiff's remaining claims in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge


Dated:      February 24, 2012
                 Syracuse, NY

25



Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Juan CANDELARIA, Plaintiff,

v.

Robert B. GREIFINGER; Bethlynn Terry; Anthony J. Annucci; Susan J. Butler; Dr. Lester Wright; Thomas Lavalley; Daniel A. Senkowski; Philip Coombe, Jr.; Mark R. Chassin, M.D.,M.P.P., M.P.H.; Public Health Council of the State of New York; Salvatore Canonico, Joseph Ostrowsky; Richard L. Herzfeld; David Neier; Quentin Moore; Kings County District Attorney; New York City Police Department; Supreme Court of the State of New York-County of Kings Criminal Term; George Pataki; Brown and Williamson Tobacco Corporation; Republic Tobacco Company, Defendants.

No. 96-CV-0017 (RSP/DS).

June 8, 1998.

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Department of Law, the Capitol, Albany, New York, for State Defendants, Howard L. Zwickel, Asst. Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, J.

**\*1** This matter comes to me following a report-recommendation by Magistrate Judge Daniel Scanlon, duly filed on the 24th day of April, 1998. Ten days after service thereof, the Clerk of the Court has sent me the entire file, including any and all objections filed by the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes, Candelaria challenges the conditions of his confinement at Clinton Correctional Facility ("Clinton"). Candelaria moved for injunctive relief requiring Clinton to transport physically disabled inmates in a wheelchair-accessible vehicle. Dkt. No. 15. On April 9, 1997, I concluded that Candelaria's motion could not be addressed on the record before me and remanded the issue to the magistrate judge for further consideration. Dkt. No. 99. Candelaria also renewed his motion for appointment of counsel, dkt. nos. 115, 116, and 121, and requested an extension of time in which to provide the United States Marshall Service with information necessary to effect service of process on certain of the defendants, dkt. no. 121.

The magistrate judge recommended I deny as moot Candelaria's motion for injunctive relief, on the grounds that Candelaria had been transferred from Clinton to Elmira Correctional Facility. Dkt. No. 123. In addition, the magistrate judge denied Candelaria's motion for appointment of counsel, granted his motion for an extension of time in which to provide information relevant to service, and recommended that, in the event Candelaria fails to provide the Court with completed USM-285 forms for each of the unserved defendants within forty-five (45) days of the date of the magistrate judge's order, the action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

be dismissed as to those defendants for whom Candelaria had not submitted the forms. *Id.*

After careful review of the record, including the report-recommendation, to which the parties submitted no objections, I conclude that the magistrate judge's findings were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved, and it is further

ORDERED that Candelaria's motion for injunctive relief concerning the transportation of disabled inmates is DENIED as moot, and it is further

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM-285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

ORDER and REPORT-RECOMMENDATION

SCANLON, Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action

in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. *See* Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. *See* Dkt. No. 121.[FN1] These matters will be addressed separately below.

FN1. The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin-Powers of Attorney-and-Last Will and Testament." *See* Dkt. No. 116.

*I. Injunctive Relief*

**\*2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. *See* Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. *See* Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. *See* Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. *Id.* at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. *See* Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. *See id.* Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. *See* Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. *See* Dkt. No. 121.[FN2]

> [FN2.] Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

It is settled in this Circuit that a transfer from a prison

facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.[FN3]

> [FN3.] In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

*II. Appointment of Counsel*

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

**\*3** Accordingly, plaintiff's requests for appointment of counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

*III. Service of Process*

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18-20. Upon the completion of a new USM-285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107.[FN4]

> **FN4.** The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM-285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork.[FN5]

> **FN5.** Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM-285 forms. Said forms shall contain any and all information presently known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on the these defendants in accordance with the Federal Rules of Civil Procedure and the July Order.[FN6] Candelaria is advised that his failure to timely provide the Service with the completed USM-285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

> **FN6.** The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord, Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM-285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM-285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM-285 forms from Candelaria, and it is further

**\*4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary*

*of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Candelaria v. Greifinger

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *See Harris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.; Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g., Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Alphonso DUKES, Plaintiff,
v.
The TROY HOUSING AUTHORITY; the City of Troy;
Jason C. Stocklas, Individually and as Agent, Servant
and/or Employee of the Troy Housing Authority and/or
as Agent, Servant and/or Employee of the City of Troy;
and Matthew D. McLaughlin, Individually and as Agent,
Servant and/or Employee of the Troy Housing Authority
and/or as Agent, Servant and/or Employee of the City of
Troy, Defendants.
No. 1:08–CV–479 (FJS/DRH).

March 31, 2011.

Harris, Conway & Donovan, PLLC, Michael C. Conway,
Esq., of Counsel, Albany, NY, for Plaintiff.

Bailey, Kelleher & Johnson, PC, Nannette R. Kelleher,
Esq., of Counsel, Albany, NY, for Defendant City of Troy.

Rehfuss, Liguori & Associates, PC, Stephen J. Rehfuss,
Esq., of Counsel, Latham, NY, for Defendants Troy
Housing Authority, Jason C. Stocklas, and Matthew D.
McLaughlin.

### MEMORANDUM–DECISION AND ORDER

SCULLIN, Senior District Judge.
### I. INTRODUCTION

*1 Currently before the Court is Defendant City of
Troy's ("Troy") motion for summary judgment on both its
cross-claim and Plaintiff's claims. See Dkt. No. 38–1. Also
pending is Defendant Troy Housing Authority ("THA"),
[FN1] Defendant Jason C. Stocklas ("Stocklas"), and
Defendant Matthew D. McLaughlin's ("McLaughlin") motion
for summary judgment with respect to Plaintiff's
claims and co-Defendant Troy's cross-claim for
indemnification/contribution. See Dkt. No. 36–1.

FN1. Unless otherwise specified, when referring
to Defendant THA, the Court is also referring to
Defendant Stocklas and Defendant McLaughlin.

Defendant Troy argues that it is entitled to summary
judgment because Plaintiff has failed to demonstrate that
material questions of fact exist regarding the claims that he
has asserted against it and because Defendant THA has
failed to show that Defendant Troy may be held
accountable for Defendant Stocklas' off-duty actions. See
Dkt. No. 59.

Defendant THA asserts that it is entitled to summary
judgment because (1) there is no evidence establishing
municipal liability pursuant to 28 U.S.C. § 1983; (2)
Plaintiff has failed to establish an equal protection claim
because he failed to show that he was treated differently
than other similarly situated individuals; (3) Plaintiff is
collaterally estopped from asserting that his arrest lacked
probable cause; (4) the evidence does not support a
finding that Defendant THA failed to provide Plaintiff
with prompt medical treatment; (5) any force used was not
excessive; (6) Plaintiff's conspiracy claim asserts only bare
and conclusory allegations; and (7) Plaintiff's negligence
claim is based on his arrest; and, therefore, it is a
malicious prosecution cause of action and not one for
negligence.

### II. BACKGROUND

On the evening of March 28, 2006, at approximately
8:00 p.m., Defendant Stocklas pulled over Plaintiff. At the
time of the stop, Defendant Stocklas was on duty as a
peace officer for Defendant THA, for whom he worked
part time. After pulling to the side of the road, Defendant
Stocklas approached Plaintiff's vehicle and identified
himself as both a THA officer and a Troy Police Officer.
See Affidavit of Michael C. Conway sworn to January 4,
2010 ("Conway Aff."), at Exhibit "B," at 33. Defendant
Stocklas informed Plaintiff that he had stopped him
because he was operating after dark without his headlights
on and also because his vehicle had an illegal window tint.
See id. at 27.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

Initially, Plaintiff was hesitant to provide Defendant Stocklas with identification, but eventually he produced his New York State Driver's License. *See* Affidavit of Stephen J. Rehfuss dated November 10, 2009 ("Rehfuss Aff."), at Exhibit "N," at 55, 58–59. After obtaining the license, Defendant Stocklas returned to his THA vehicle. Remembering that he also had his employment identification card, which identified him as a Capital District Transportation Authority bus driver, Plaintiff exited his vehicle and proceeded to walk towards Defendant Stocklas' vehicle, while shouting that he had his employee identification. *See id.* at 63.

**\*2** At this point, Defendant McLaughlin arrived on the scene and, upon seeing Plaintiff walking towards Defendant Stocklas' vehicle, twice commanded Plaintiff to return to his vehicle. *See id.* at 68. Plaintiff contends that, as he was walking back to his vehicle as commanded, Defendant McLaughlin sprayed him in the back of the head with pepper spray and then slammed him into the front of his car. *See id.* at 71–72, 73. As Defendant McLaughlin was attempting to handcuff Plaintiff, Plaintiff informed him that he was unable to put his arm behind his back because he recently had surgery performed on his shoulder. *See id.* at 72. At this point, Defendant McLaughlin kneed Plaintiff in the back and "snapped" his arm behind his back and handcuffed him. *See id.*

After being taken into custody, Plaintiff was transported to the Troy Police Department, where he was held and processed.[FN2] When asked if he wanted medical attention, Plaintiff declined and opted to be arraigned as soon as possible. At the time of arraignment, Plaintiff was advised that he was being charged with three misdemeanor counts. *See* Affidavit of Alphonso Dukes sworn to January 2, 2010 ("Dukes Aff."), at Exhibit "C." In two of the counts, Defendant Stocklas identified himself as a Troy Police Officer. *See id.*

> **FN2.** Plaintiff claims, for the first time in his affidavit in response to Defendants' motions for summary judgment, that, when he was first brought into the Police Station, Defendant McLaughlin visited him and punched him in the stomach several times. Plaintiff did not make this assertion in his complaint, in his criminal pretrial

deposition, or at any other point. Notably, in his deposition, Plaintiff stated that Defendant Stocklas drove him to the police station and discussed what was said between them but did not mention this alleged assault. *See* Rehfuss Aff. at Exhibit "N," at 87–89.

Following arraignment, Plaintiff was transported to the Rensselaer County Jail, where he was held for more than two days. Plaintiff asserts that he was denied access to a physician and the opportunity to take pain medication during this time. Upon release, Plaintiff sought medical attention for his shoulder injury and eventually underwent surgery.

Subsequently, Plaintiff was acquitted of all of the criminal charges arising out of the incident in question. *See* Rehfuss Aff. at Exhibit "L" (providing that all charges against Plaintiff were dismissed pursuant to New York Criminal Procedure Law § 160.50—a dismissal in the interests of justice). [FN3] On May 5, 2008, Plaintiff commenced the present action

> **FN3.** The document actually states that the charges were dismissed pursuant to "CPL–16.50," which does not exist.

to redress the deprivation by Defendants of rights, privileges and immunities secured to Plaintiff by the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America with the intent to deny Plaintiff his civil rights, all of which arise under Federal Law, particularly Title 42 U.S.C. Sections 1983 and 1988, and the Constitution, Laws and Statutes of the United States and the State of New York.

*See* Complaint at ¶ 1.

In its answer, Defendant Troy asserted a cross-claim against Defendant THA for indemnification, alleging that Defendant Troy had no involvement with the alleged unconstitutional conduct.

### III. DISCUSSION

A court may grant a motion for summary judgment only if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36 (quotation and other citation omitted). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted).

**A. Plaintiff's claims against the individual Defendants**

**1. Search and seizure, false arrest and unlawful imprisonment**

**\*3** Defendants assert that the doctrine of collateral estoppel bars Plaintiff's unlawful search and seizure, false arrest, and unlawful imprisonment claims. *See* Dkt. No. 36–1 at 11.[FN4]

> **FN4.** Although Defendant THA asserts that collateral estoppel bars Plaintiff's unlawful search and seizure, false arrest, and unlawful imprisonment claims, it does not otherwise challenge the validity of these claims.

> To the extent that Defendant Troy asserts that these claims fail on the merits because the individual Defendants had probable cause, the Court must deny Defendant Troy's motion. *See* Dkt. No. 38–1 at 18–19. Material issues of fact exist regarding whether the individual Defendants had probable cause to arrest Plaintiff for the crimes for which he was charged. *See Jenkins v. City of N.Y.,* 478 F.3d 76, 88 (2d Cir.2007) (holding that, "[i]f, ... on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims"). Moreover, if Plaintiff establishes that Defendants lacked probable cause for his

arrest, then any search performed subsequent to that unlawful arrest would, likewise, have been unlawful.

The Second Circuit has clearly established that federal law applies in determining the preclusive effect of a federal judgment, while "New York law [applies] in determining the preclusive effect of a New York State court judgment[.]" *Marvel Characters, Inc. v.. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citations omitted). Although application of either would frequently lead to the same result, "these two bodies of law do appear to diverge in some particulars[.]" *Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.,* 493 F.3d 283, 288 (2d Cir.2007) (citation omitted).

In *Schwartz v. Pub. Adm'r of Cnty. of Bronx,* 24 N.Y.2d 65 (1969), the New York Court of Appeals stated that a litigant may invoke the doctrine of collateral estoppel where there is an "identity of issue which has necessarily been decided in the prior action and is decisive of the present action," so long as the party against whom preclusion is asserted had a "full and fair opportunity to contest the decision now said to be controlling." *Id.* at 71. Accordingly, a party may invoke collateral estoppel to preclude a party from raising an issue " '(1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate' ... [and (3) that is] 'decisive [in] the present action.' " *Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003) (quotations and footnote omitted).

"The party seeking the benefit of collateral estoppel has the burden of demonstrating the identity of the issues ... whereas the party attempting to defeat its application has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action[.]" *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456 (1985) (citations omitted).

In determining whether a party had a full and fair opportunity to litigate the issue, the New York Court of Appeals has instructed that "the various elements which make up the realities of litigation," should be explored, including "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation."

*Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 734 (2d Cir.2001) (quoting *Schwartz,* 24 N.Y.2d at 72, 298 N.Y.S .2d at 961, 246 N.E.2d 725). Further, an issue is decisive of the present action "if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint." *Curry,* 316 F.3d at 332.

In the present matter, collateral estoppel does not operate to bar any of Plaintiff's claims because he was not provided with a "full and fair opportunity to contest the decision now said to be controlling." *Schwartz,* 24 N.Y.2d at 71. Specifically, although the Troy City Court found that Defendant Stocklas and Defendant McLaughlin had probable cause to stop and then arrest Plaintiff, he was not provided with an opportunity to appeal that decision because the criminal charges were later dismissed. *See* Dkt. No. 36–5 at Exhibit "L"; *see also Rivera v. Metakes,* 216 F.3d 1073, 2000 WL 777954, *1 (2d Cir. June 15, 2000)* (holding that, "[u]nder New York law, facts determined in a pretrial hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges or against whom the charges have been dismissed" (citations omitted)).

*4 Accordingly, the Court denies Defendants' motion for summary judgment on this ground.[FN5]

> FN5. Although a dismissal in the interests of justice precludes a later civil action for malicious prosecution, such a dismissal does not preclude unlawful search and seizure, false arrest, or unlawful imprisonment claims. *Cf. Hygh v. Jacobs,* 961 F.2d 359, 363, 367–68 (2d Cir.1992) (allowing false arrest verdict to stand but dismissing malicious prosecution charge because the underlying criminal charge was dismissed in the interests of justice).

**2. Plaintiff's equal protection claim**

Ordinarily, "[t]o state a claim for an equal protection violation, [the plaintiff] must allege that a government actor intentionally discriminated against [him] on the basis of race, national origin or gender." *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 48 (2d Cir.1999). The plaintiff must allege that he was " 'selectively treated' " as " 'compared with others similarly situated' " based on " 'impermissible considerations' " such as race or with the " 'intent to inhibit or punish the exercise of constitutional rights [.]' " *Giordano v. City of N.Y.,* 274 F.3d 740, 750–51 (2d Cir.2001) (quotation omitted).

In this case, Plaintiff has not established differential treatment that resulted from intentional and unlawful discrimination. In neither his complaint nor his response to Defendants' interrogatories does Plaintiff allege or offer evidence to demonstrate that Defendants treated him differently from the way that they treated other similarly situated individuals. *See* Dkt. No. 1; *see also* Rehfuss Aff. at Exhibit "K," at ¶¶ 11–12. Further, in his response to Defendant THA's motion for summary judgment, Plaintiff fails to address Defendant THA's assertion that the Court should dismiss his equal protection cause of action; and, thus, the Court concludes that Plaintiff has abandoned this claim. *See Rohn Padmore, Inc. v. LC Play, Inc.,* 679 F.Supp.2d 454, 459 (S.D.N.Y.2010) (holding that, " '[w]here one party fails to respond to an opposing party's argument that its claim must be dismissed, courts may exercise their discretion and deem the claim abandoned' " (quotation omitted)).

Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's equal protection cause of action.

**3. Plaintiff's conspiracy claim**

In his second cause of action, Plaintiff alleges that Defendants conspired together to violate his constitutional rights. *See* Complaint at ¶¶ 34–37. [FN6]

> FN6. Since it is unclear whether Plaintiff is attempting to assert a section 1983 or a section 1985(3) conspiracy claim, the Court will address both.

To sustain a cause of action for conspiracy to violate a plaintiff's civil rights under section 1985(3), a plaintiff must allege and demonstrate that the defendants acted with

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunities secured by law. *See Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (citations omitted). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995) (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)) (other citations omitted).

**\*5** " 'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.' " *Benitez v. Ham,* No. 9:04–CV–1159, 2009 WL 3486379, \*18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "In other words, plaintiff must demonstrate that defendants ... 'agreed' or 'reached an understanding' to violate his constitutional rights." *Porter v. Selsky,* 287 F.Supp.2d 180, 187 (W.D.N.Y.2003) (quotation omitted).

For both types of conspiracy claims, "[c]onclusory or vague allegations of conspiracy are insufficient to survive a motion for summary judgment." *Zaidi v. Amerada Hess Corp.,* 723 F.Supp.2d 506, 515 (E.D.N.Y.2010) (citing *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)). Specifically, the plaintiff must provide some factual basis supporting a meeting of the minds, such as that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end[;]" the plaintiff must also " 'provide some details of time and place and the alleged effects of the conspiracy." ' " *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (quotation and other citation omitted).

Plaintiff has not adequately pled a claim for conspiracy to deny his civil rights under either section 1983 or section 1985(3). He fails to allege or offer any proof that Defendants agreed to, or reached an understanding to, violate his civil rights. Moreover, as with his equal protection claim, Plaintiff failed to respond

to Defendant THA's motion for summary judgment with regard to his conspiracy claim. As such, the Court concludes that Plaintiff has abandoned this claim. *See Rohn Padmore, Inc.,* 679 F.Supp.2d at 459 (quotation omitted).

Based on the foregoing, the Court grants Defendants' motion with respect to Plaintiff's second cause of action for conspiracy to violate his civil rights. Even if the Court were to find that Plaintiff had not abandoned this claim, it would fail on the merits for the reasons discussed.

### 4. Denial of prompt medical care

In his first and third causes of action, Plaintiff claims that Defendants violated his federal and New York State constitutional right to prompt medical attention. *See* Complaint at ¶¶ 31–33, 39–41. Defendants assert that the evidence does not support this claim.

"[A] claim for indifference to the medical needs of [a plaintiff], as a pretrial detainee in state custody, [i]s properly brought under the Due Process Clause of the Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (citation omitted).[FN7] When a denial of medical care claim arises in the context of arrest and pretrial detainment, "the official custodian of [the arrestee] may be found liable for violating the [arrestee's] due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citation omitted). This standard includes both objective and subjective criteria, requiring the plaintiff to show that (1) " '[he] had a "serious medical condition" ' " and (2) that " 'it was met with "deliberate indifference." ' " *Caiozzo,* 581 F.3d at 72 & n. 4 (quotation and other citations omitted).

> **FN7.** Although Plaintiff properly brought this claim under the Due Process Clause of the Fourteenth Amendment, the standard of review for such claims is the same deliberate indifference standard that courts apply to claims that convicted inmates bring under the Eighth Amendment. *See Caiozzo,* 581 F.3d at 70 (citation omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

**\*6** "The first requirement is objective: the alleged deprivation of adequate medical care must be " 'sufficiently serious.' " " *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (quotation omitted). Determining whether a deprivation is "sufficiently serious" requires two inquiries. *See id.* First, a court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Second, a court must determine "whether the inadequacy in medical care is sufficiently serious." *Id.* 280.FN8 "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citation omitted). Some factors relevant to the seriousness of a medical condition include (1) "whether 'a reasonable doctor or patient would find [it] important and worthy of comment[;]' " (2) "whether the condition 'significantly affects an individual's daily activities[;]' " and (3) "whether it causes 'chronic and substantial pain.' " *Id.* (quotation omitted). Thus, an alleged deprivation is sufficiently serious where " 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (quotation omitted).

> FN8. In *Salahuddin,* the Second Circuit held that, "if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin,* 467 F.3d at 280 (citation omitted).

The second requirement is subjective: "the charged official must act with a sufficiently culpable state of mind[,]" *i.e.,* deliberate indifference. *Salahuddin,* 467 F.3d at 280 (citation omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Id.* (citation omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citation omitted). This means that the prison official "must be subjectively aware that his conduct creates such a risk." *Id.* at 281 (citation omitted).

A delay in medical treatment does not by itself violate an inmate['s] Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.

*Mitchell v. N.Y.C. Dep't of Corr.,* No. 10 CV 0292, 2011 WL 503087, \*4 (S.D.N.Y. Feb. 14, 2011) (citation omitted).

Plaintiff's deposition testimony clearly indicates that Defendants' actions did not rise to the level of deliberate indifference. Plaintiff admits that he never told either Defendant Stocklas or Defendant McLaughlin that he was injured at any point; he merely stated that he was in pain and asked Defendant Stocklas to loosen the handcuffs. *See* Rehfuss Aff. at Exhibit "N," at 86–88. Further, Plaintiff testified that he told a desk sergeant at the police station approximately forty-five minutes after he arrived that he was injured and that he wished to go to the hospital. *See id.* at 87–91. However, after the desk sergeant informed Plaintiff that, if he went to the hospital he would not be arraigned and released until the next day, Plaintiff decided to wait until after his arraignment to seek treatment. *See id.* at 92.

**\*7** After Plaintiff had been at the Troy police station for less than an hour and a half, he was brought to court to be arraigned. *See id.* at 93. Plaintiff was denied bail and was transported to the Rensselaer County Jail immediately following his arraignment. *See id.* at 95–96. Upon arrival at the Rensselaer County Jail, Plaintiff informed an unnamed employee that he needed medical attention and was sent to see a nurse. *See id.* at 99–100. Plaintiff remained at the Rensselaer County Jail for two days. *See id.* at 101.

Based on this testimony, it is clear that none of the named Defendants exhibited deliberate indifference to Plaintiff's medical condition. He was in Defendants' custody for less than two hours, and one of Defendant Troy's employees offered him treatment. Moreover, Plaintiff's injury was not "life-threatening and fast degenerating" so as to require immediate medical attention. *Mitchell,* 2011 WL 503087, at \*4 (citation omitted). Although Plaintiff may have been in pain during

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

his brief stint in Defendants' custody, all named Defendants acted reasonably under the circumstances. Finally, Plaintiff admits that he never informed Defendant Stocklas, Defendant McLaughlin, or any other employee that he needed medical attention.

Based on the foregoing, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claim for denial of prompt medical care.

### 5. Plaintiff's excessive force and assault causes of action

Plaintiff's first and third causes of action allege excessive force in violation of his New York State and Federal Constitutional rights. *See* Complaint at ¶¶ 31–33, 39–41. Moreover, Plaintiff's sixth cause of action alleges a state-law cause of action for assault. *See id.* at ¶¶ 50–52.

Assault and battery claims under New York law are analogous to excessive force claims under the Fourth Amendment. *See Cosby v. City of White Plains,* No. 04 Civ. 5829, 2007 WL 853203, *6 (S.D.N.Y. Feb. 9, 2007). Indeed, courts evaluate assault and battery claims under New York law and excessive force claims under the Fourth Amendment pursuant to the same standards. *See id.* (citing *Posr v. Doherty,* 944 F.2d 91, 94–95 (2d Cir.1991)). A plaintiff alleging excessive force must demonstrate that the use of force was objectively unreasonable in light of the facts and circumstances confronting the officers, without regard to the officers' underlying intent or motivation. *See Anderson v. Branen,* 17 F.3d 552, 559 (2d Cir.1994) (citation omitted).

This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989) (citation omitted). "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 123 (2d Cir.2004) (citation omitted).

**\*8** Plaintiff's allegations are sufficient to create issues of fact about the objective reasonableness of the degree of force that Defendant McLaughlin used. Specifically, Plaintiff asserts that, although he did not act aggressively toward either officer and did nothing more than exit his vehicle and walk back toward Defendant Stocklas' Housing Authority vehicle, Defendant McLaughlin pepper sprayed him, smashed his head into the roof of his car, and wrenched his right arm up behind his back (ripping his right rotator cuff). *See* Dkt. No. 44 at 8. Such assertions clearly create issues of fact precluding summary judgment on Plaintiff's excessive force and assault claims against Defendant McLaughlin.[FN9]

> FN9. In *Jones v. Parmley,* 465 F.3d 46 (2d Cir.2006), the Second Circuit clarified its prior decision in *Atkins v. New York City,* 143 F.3d 100 (2d Cir.1998), and reiterated that the existence of an unlawful seizure does not necessarily mean that any use of force during such seizure is *per se* excessive or unlawful. *See Jones,* 465 F.3d at 62. More specifically, in *Jones,* the court rejected the argument that force used during an arrest without probable cause is *per se* excessive and, instead, emphasized that the same reasonableness standard articulated in *Graham* applied to those situations as well.

> There was ... no need for this Court in *Atkins* to reach the question of whether any force used in an arrest lacking probable cause is *per se* excessive. Such a construction would read the highly fact-specific situation in which *Atkins* arose too broadly because it would appear to suggest that any force employed by a police officer would be unlawful so long as probable cause did not exist, even if the detainee had threatened the officer with significant harm. We are further mindful that the Supreme Court held in *Graham* that "all claims that law enforcement officers have used excessive force ... should be analyzed under the ... 'reasonableness' standard" of the Fourth Amendment, thereby establishing a general requirement. 490 U.S. at 395, 109 S.Ct. 1865 (emphasis in original). The *Atkins* court clearly

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

did not intend to create or substitute a new standard for arrests lacking probable cause, and the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.

*Id.*

In the present matter, Plaintiff does not merely claim that any force that Defendant McLaughlin used was unreasonable because the arrest was illegal but also asserts a separate excessive force claim. As noted, the Court finds that Plaintiff has set forth facts, which, if believed, could establish that the amount of force that Defendant McLaughlin used was objectively unreasonable. Accordingly, Plaintiff's excessive force and illegal arrest claims do not merge.

On the other hand, Plaintiff does not allege that Defendant Stocklas failed to intervene or that he used any force other than the force involved in handcuffing Plaintiff.[FN10] *See* Dkt. No. 42 at ¶ 15. In fact, all of Plaintiff's allegations regarding the use of force relate to Defendant McLaughlin's, not Defendant Stocklas', use of force against him. *See id.* at ¶¶ 12–18. Therefore, the Court grants Defendant Troy's and Defendant THA's motions for summary judgment with respect to Plaintiff's excessive force and assault causes of action against Defendant Stocklas.

FN10. In fact, Plaintiff's affidavit does not make clear whether Defendant Stocklas was even the one who handcuffed him. *See* Dkt. No. 42 at ¶ 15. For purposes of this Memorandum–Decision and Order, however, the Court has assumed that Defendant Stocklas did, in fact, handcuff Plaintiff.

**6. Plaintiff's due process claim**

In Plaintiff's first and third causes of action he alleges a denial of his due process rights in connection with his March 28, 2006 arrest and subsequent detention. *See* Complaint at ¶¶ 31, 39. Defendants assert that Plaintiff's due process claims fail as a matter of law because there was probable cause to support Plaintiff's arrest and because the arresting officers acted reasonably under the circumstances. *See* Dkt. No. 36–1 at 15.

"Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law." *United States v. McDermott,* 918 F .2d 319, 325 (2d Cir.1990). "Where ... probable cause has been clearly established, there can be no claim for denial of either the procedural or substantive right to due process." *Harris v. Cnty. of Nassau,* 581 F.Supp.2d 351, 357 (E.D.N.Y.2008) (citations omitted).

In the present matter, factual issues exist that preclude granting summary judgment with regard to this claim. Although Defendants claim that Plaintiff failed to return to his car when Defendant McLaughlin ordered him to do so, Plaintiff disputes this fact. Without this failure to obey, Defendants only had probable cause to issue Plaintiff a traffic ticket for operating his vehicle without headlights; they did not have probable cause to arrest Plaintiff.[FN11]

FN11. Although Plaintiff admits that his headlights were off, it is clear that such a minor traffic infraction would not warrant an arrest.

Accordingly, the Court denies Defendants' motion for summary judgment with regard to Plaintiff's due process causes of action.

**7. Qualified immunity**

Defendants claim that Defendant Stocklas and Defendant McLaughlin are entitled to qualified immunity with regard to all of Plaintiff's constitutional claims. *See* Dkt. No. 36–1 at 21.

***9** Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

from damages but also "immunity from suit"). "[T]he salient question [in determining qualified immunity] is whether the state of the law ... gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002). As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants. *See Gomez v. Toledo,* 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997) (holding that "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider in either order. *See Seri v. Bochicchio,* 374 Fed. Appx. 114, 116 (2d Cir.2010) (citation omitted). The first step is to determine "whether the facts that a plaintiff has alleged ... make out a violation of a constitutional right." *Pearson v. Callahan,* 129 S.Ct. 808, 816 (2009) (citations omitted). The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

As discussed above, there are a multitude of factual issues that make granting qualified immunity inappropriate at this time. If the Court believes Plaintiff's version of the facts, Defendant Stocklas and Defendant McLaughlin lacked probable cause to place Plaintiff under arrest, detain him, or search his person and vehicle. Moreover, viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that the force that Defendant McLaughlin used was objectively unreasonable. Therefore, the Court denies Defendants' motions for summary judgment on this ground.

**B. Municipal liability under § 1983**

*1. Plaintiff's claims against Defendant Troy*[FN12]

> FN12. Since there is no question that Defendant McLaughlin was not an employee of Defendant Troy, the Court has focused only on Defendant

Stocklas' conduct in this section.

Defendant Troy asserts that it is entitled to summary judgment because there is no evidence establishing municipal liability pursuant to 42 U.S.C. § 1983. Specifically, Defendant Troy asserts that there is no proof of an unconstitutional municipal policy or custom and that, even if the Court were to find that Defendant Stocklas was working as a City of Troy employee at the time of the alleged violations, which he was not, he was not a policy-making official. *See* Dkt. No. 38–1 at 4–7. Furthermore, Defendant Troy asserts that Defendant THA is a separate legal entity and that Defendant THA's officers have the power to make traffic stops and arrests. *See id.* at 7–8.

**\*10** To the contrary, Plaintiff asserts that he has sufficiently established municipal liability against Defendant Troy because (1) he demonstrated that policymakers chose to ignore Defendant Stocklas' actions and (2) he suffered an " 'unusually brutal or egregious beating administered by a group of municipal employees[,]' " which warrants an inference of inadequate training or supervision amounting to deliberate indifference. *See* Dkt. No. 44 at 10–11.

Pursuant to *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658 (1978), and its progeny, a municipality cannot be held liable pursuant to section 1983 under a theory of *respondeat superior. See id.* at 691; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986) (citation omitted). Rather, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). It is well-settled that a plaintiff may establish this required causal link by showing that a defendant was deliberately indifferent to the training, supervision, or discipline of its employees. *See Amnesty Am.,* 361 F.3d at 127 (citation omitted). In this regard, the plaintiff "must establish [the defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious' " and that the defendant "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct." *Id.* (quotation omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

Although Plaintiff's complaint succinctly states one of the core legal concepts animating *Monell* liability, *i.e.,* that all named Defendants acted "with malice toward and/or reckless disregard of and/or deliberate indifference to Plaintiff's rights[,]" *see* Complaint at ¶ 32, it fails to accompany this rote recitation with factual assertions of any kind. Moreover, the sparse facts that elsewhere make their way into the pleading, and which outline a single, detached incident of misconduct by a single, non-policy level officer, *i.e.,* Defendant Stocklas, in no way suggest that municipal policymakers made a deliberate choice to turn a blind eye to unconstitutional conduct. *See Amnesty Am.,* 361 F.3d at 128; *see also Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993) (holding that "[a] single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy" (citations omitted)), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993). Moreover, although Plaintiff alleges that all Defendants acted with deliberate indifference, he fails to allege that Defendant Troy showed deliberate indifference through either its inaction regarding the conduct in question or through its failure to train and supervise its employees adequately. *See Bradley v. City of N.Y.,* No. 08–CV–1106, 2009 WL 1703237, *3 (E.D.N.Y. June 18, 2009) (holding that the "[c] omplaint's conclusory, boilerplate language—that the City 'fail[ed] to adequately train, discipline, and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees ...—is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused Plaintiff to be arrested without probable cause" (internal citation omitted)).

**\*11** In his affidavit in response to the present motions, Plaintiff's attorney makes conclusory allegations and raises issues not entirely relevant to the issue at hand. *See* Dkt. No. 41 at ¶¶ 86–92. Although it appears that Defendant Stocklas may have failed to fill out "the Troy Police Department's control/restraint report," his failure to do so and the fact that he was not reprimanded for this failure does not establish the deliberate indifference required to find Defendant Troy liable. Relatedly, nearly all of

Plaintiff's allegations concerning the force used state that Defendant McLaughlin, not Defendant Stocklas, was the one who used excessive force (or any force at all). *See* Dkt. 36–5 at 71–72; Dukes Aff. at ¶¶ 10, 12–15. Based on Plaintiff's deposition testimony, it appears that the only force Defendant Stocklas used was when he assisted Defendant McLaughlin in handcuffing Plaintiff and when he refused to loosen the handcuffs prior to reaching the station. Moreover, although Plaintiff alleges that, upon arriving at the police station garage, Defendant McLaughlin punched him in the chest several times, Plaintiff does not allege a failure to intervene against Defendant Stocklas. *See* Dukes Aff. at ¶ 19.

Further, although Plaintiff correctly asserts that a municipality can be held liable for an isolated incident, such as an "unusually brutal or egregious beating administered by a group of municipal employees[,]" *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.1980) (citations omitted), the alleged conduct does not rise to this level. The *Turpin* court went on to hold that, "absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause or with excessive use of force." *Id.* (citations omitted). Here, there was not a "group of municipal employees," and the alleged beating was not sufficiently egregious to warrant such a finding—especially when considering that the only City of Troy employee, Defendant Stocklas, employed almost no force.

Based on the foregoing, the Court grants Defendant Troy's motion for summary judgment with respect to Plaintiff's § 1983 claims.[FN13]

> FN13. Plaintiff has not alleged that he filed a notice of claim with respect to his state-law claims. In its answer, Defendant Troy raises an affirmative defense asserting that Plaintiff failed to comply with the General Municipal Law. In its motion for summary judgment, however, Defendant Troy did not move to dismiss Plaintiff's state-law claims on this ground.

**2. Plaintiff's Monell claims against Defendant THA**[FN14]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

FN14. The Court notes that Defendant THA is treated as a municipality for purposes of section 1983. *See Ramos v. City of N.Y.,* No. 96 CIV. 3787, 1997 WL 410493, *3 (S.D.N.Y. July 22, 1997) (holding that, "for the New York City Housing Authority to be held liable, [the plaintiff] must meet the standard described in *Monell v. Department of Soc. Serv. of the City of New York,* 436 U.S. 658, 694 (1978)" (citation omitted)). Further, a plaintiff bringing suit against a municipal housing authority must comply with the Notice of Claim requirements in the New York General Municipal Law for any pendent state-law claims. *See Mercier v. Mun. Hous. Auth. of City of Schenectady,* 133 A.D.2d 990, 991 (3d Dep't 1987).

Plaintiff asserts that summary judgment is inappropriate because "there is ample proof before this Court that [Defendant THA] grossly ignored what took place at the traffic stop in question—in what could reasonably be seen as an effort to disregard the constitutional violations—and cover-up the illegal conduct." *See* Dkt. No. 44 at 11. Plaintiff asserts that Defendant THA's Director of Public Safety, Mr. Mason, learned about the incident in question soon after it took place, yet neither he nor Defendant Stocklas nor Defendant McLaughlin prepared a use of force report as Defendant THA's policy required. *See* Dkt. No. 41 at ¶¶ 76–77. Moreover, Plaintiff asserts that it was uncommon for Defendant THA's officers to follow the use of force policy and that there was no formal training on when it was appropriate to use pepper spray, yet Defendant THA provided pepper spray to every peace officer whom it employed. *See id.* at ¶ 80.

**\*12** As discussed, it is well-settled that a plaintiff may establish the required causal link between a defendant municipality and its employee's actions by showing that the defendant was deliberately indifferent to the training, supervision, or discipline of its employees. *See Amnesty Am.,* 361 F.3d at 127 (citation omitted).

Plaintiff correctly asserts that his allegations are sufficient to survive summary judgment on the issue of whether Defendant THA failed to train, supervise, and

discipline its employees properly. Director Mason's failure either to fill out a use of force report or to require Defendant Stocklas or Defendant McLaughlin to fill out such a report demonstrates a possible conscious disregard and potential ratification of unconstitutional actions on the part of Defendant THA. Moreover, Defendant THA has not established that it punished Defendant Stocklas or Defendant McLaughlin for their failure to follow Defendant THA's use of force policy, which could be interpreted as those individual Defendants' attempt to avoid the investigation that would have resulted if they had filed such a use of force report. Finally, Plaintiff asserts that Defendant THA's peace officers are all provided with pepper spray, but are not provided with any training on when its use is appropriate. These allegations create issues of fact regarding whether Defendant THA was deliberately indifferent to the training, supervision, or discipline of its employees.

Based on the foregoing, the Court denies Defendant THA's motion for summary judgment with respect to Plaintiff's *Monell* claim.

**C. Plaintiff's remaining state-law claims**[FN15]

FN15. As previously discussed, Plaintiff also asserted state-law assault and battery, due process, unlawful search and seizure, false arrest, unlawful imprisonment, denial of prompt medical care and equal protection causes of action.

**1. Plaintiff's negligence claim**

In his fifth cause of action, Plaintiff claims that Defendants were "negligent in the manner in which they treated and handled [him]." *See* Complaint at ¶ 46. In his sixth cause of action, Plaintiff alleges that Defendants intentionally caused him harm. *See id.* at ¶¶ 50–51. Defendant THA asserts that Plaintiff's negligence cause of action fails as a matter of law because "a party cannot allege intentional conduct and seek recovery based on negligence, or maintain a negligence cause of action with respect to an arrest." *See* Dkt. No. 36–1 at 16. Moreover, Defendant THA claims that, under New York law, when a negligence cause of action is based on an arrest, the plaintiff must resort to the traditional remedies of false

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

imprisonment and malicious prosecution. *See id.* at 17.

To establish a *prima facie* case of negligence, a plaintiff must show (1) a duty that the defendant owes to the plaintiff, (2) a breach of that duty, and (3) an injury proximately resulting therefrom. *See Solomon by Solomon v. City of N.Y.,* 66 N.Y.2d 1026, 1027 (1985) (citation omitted). If the plaintiff alleges facts that support a claim for excessive force or assault and battery, "he may not also base a claim of negligence on the same conduct." *Morgan v. Nassau Cnty.,* No. 03–CV–5109, 2009 WL 2882823, *19 (E .D.N.Y. Sept. 2, 2009) (citations omitted).

**\*13** Aside from asserting that he is not collaterally estopped from raising this claim and that there are issues of fact precluding summary judgment, Plaintiff has failed to respond to this aspect of Defendant THA's motion. Based on the complaint's language, Plaintiff's negligence claim is predicated on the same conduct Plaintiff alleges in support of his excessive force and assault causes of action. Accordingly, the Court grants Defendants' motions with respect to Plaintiff's fifth cause of action for negligence.

### 2. Was Defendant Stocklas acting as a THA peace officer or as a Troy City Police Officer, or in both capacities, at the time of the incident?[FN16]

> FN16. Although the Court has already dismissed all of Plaintiff's federal claims against Defendant Troy, this discussion is still relevant to Plaintiff's remaining state-law claims and Defendant Troy's and Defendant THA's cross-claim for indemnification/contribution.

In the underlying criminal action, Judge Maier determined that, on the night in question, Defendant Stocklas was acting as an employee of both Defendant Troy and Defendant THA. As such, Defendant THA asserts that Defendant Troy is liable for any damages that Plaintiff may be awarded in this matter. Defendant Troy asserts that Judge Maier's finding does not have preclusive effect. *See* Dkt. No. 38–1 at 12. Defendant Troy claims that it and the County District Attorney's Office are not in privity with one another; and, therefore, it was not a party to Plaintiff's criminal proceeding. *See id.* Defendant THA asserts that the Court should dismiss Defendant Troy's cross-claim because, during the night in question,

Defendant Stocklas was acting in his capacity as both a Troy Police Officer and as a THA patrolman. *See* Dkt. No. 36–1 at 23. Further, Defendant THA asserts that the Troy City Court already decided this issue. *See id.*

To determine whether Defendant Stocklas was acting in his role as a Defendant THA peace officer, a Defendant Troy police officer, or both, the Court must consider both " 'the capacity in which the off-duty police officer was functioning when the officer initially confronted the situation and ... the manner in which he ... conducted himself ... from that point forward.' " *United States v. Couch,* 378 F.Supp.2d 50, 55 (N.D.N.Y.2005) (quotation and other citations omitted). Moreover, the Court must consider whether Defendant Stocklas had the authority to perform the traffic stop in question and subsequent arrest pursuant to his authority as a Defendant THA peace officer. *See People v. Williams,* 4 N.Y.3d 535, 537–38 (2005).

Under New York law, a "peace officer" has the powers, among others, to make warrantless arrests and to issue appearance tickets and simplified traffic informations whenever acting pursuant to his special duties. *See* N.Y.Crim. Proc. Law §§ 2.10(58), 2.20(1)(a)-(e).[FN17] "Peace officers" are officials "who perform[ ] a law enforcement function for an agency that does not have policing as its central mission." Peter Prieser, Practice Commentaries, N.Y.Crim. Proc. Law § 2.10 (McKinney 2003). Among the officers designated as "peace officers" under the Criminal Procedure Law are "[u]niformed members of the security force of the Troy housing authority [.]" *See* N.Y.Crim. Proc. Law § 2.10(58).

> FN17. Some of the powers afforded to peace officers include
>
> (a) The power to make warrantless arrests pursuant to section 140.25 of this chapter.
>
> (b) The power to use physical force and deadly physical force in making an arrest or preventing an escape pursuant to section 35.30 of the penal law.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

(c) The power to carry out warrantless searches whenever such searches are constitutionally permissible and acting pursuant to their special duties.

(d) The power to issue appearance tickets pursuant to subdivision three of section 150.20 of this chapter, when acting pursuant to their special duties....

(e) The power to issue uniform appearance tickets pursuant to article twenty-seven of the parks, recreation and historic preservation law and to issue simplified traffic informations pursuant to section 100.25 of this chapter and section two hundred seven of the vehicle and traffic law whenever acting pursuant to their special duties.

See N.Y.Crim. Proc. Law § 2.20(1)(a)-(e).

Moreover, the statute provides that "a peace officer acts pursuant to his special duties when he performs the duties of his office, pursuant to the specialized nature of his particular employment, whereby he is required or authorized to enforce any general, special or local law or charter, rule, regulation, judgment or order." N.Y.Crim. Proc. Law § 2.20(2).

**\*14** Under section 31 of the New York Public Housing Law, the territorial jurisdiction of a city's public housing authority is conterminous with the territorial limits of that city. See N.Y. Pub. Hous. Law § 31. Moreover, New York Criminal Procedure Law provides that

[t]he "geographical area of employment" of any peace officer employed as such by an agency of a county, city, town or village consists of (i) such county, city, town or village, as the case may be, and (ii) any other place where he is, at a particular time, acting in the course of his particular duties or employment[.]

N.Y.Crim. Proc. Law § 140.25(5)(b).

At this point, it is unclear whether Defendant THA

peace officers are provided with traffic summons through Defendant THA or if all Defendant THA peace officers simply issue Troy Police Department traffic tickets. Moreover, it is unclear whether every arrest that a Defendant THA peace officer makes is processed at the Troy Police Department and, if so, the nature of the cooperation agreement between the two agencies. Moreover, Defendant THA asserts that "[i]t was common practice for Officer Stocklas, while on-duty as a THA patrolman, to respond to calls, make arrests and provide backup as a Troy Police Officer." See Dkt. No. 36–1 at 23 (citation omitted). Finally, Plaintiff claims that Defendant Stocklas stated that he was both a Defendant Troy police officer and a Defendant THA peace officer. Therefore, the Court denies Defendant Troy's motion for summary judgment regarding this issue. [FN18]

FN18. Although the Court has dismissed Plaintiff's *Monell* claims against Defendant THA, Plaintiff still has several state-law causes of action that could subject Defendant Troy to liability. See *Raysor v. Port Auth. of N.Y. & N.J.,* 768 F.2d 34, 38 (2d Cir.1985) (dismissing section 1983 claims under *Monell* but permitting state-law claims based on *respondeat superior* to proceed (citations omitted)).

**D. Defendant THA's motion for summary judgment with regard to Defendant Troy's cross-claim and Defendant Troy's motion for summary judgment on its cross-claim**

Defendant Troy asserted a cross-claim against Defendant THA, claiming that any liability imposed on it is assignable to its co-Defendants. Defendant THA asserts that the Court should dismiss this cross-claim because there are no issues of material fact regarding the fact that, on the night in question, Defendant Stocklas was acting in his capacity as both a Defendant Troy police officer and a Defendant THA peace officer. See Dkt. No. 36–1 at 22–23. Further, Defendant THA claims that the Troy City Court already decided this issue and held that Defendant Stocklas was acting in this dual capacity. See id. at 23.

As previously discussed, collateral estoppel does not apply to this state-court proceeding because the charges were eventually dismissed against Plaintiff, thereby precluding appellate review. Further, as discussed, issues

Slip Copy, 2011 WL 1261317 (N.D.N.Y.)

(Cite as: 2011 WL 1261317 (N.D.N.Y.))

of fact exist as to whether Defendant Stocklas was working in a dual capacity on the night in question. Since it is premature for the Court to determine whether Defendant Stocklas was working for both Defendant THA and Defendant Troy or just Defendant THA at the time of the arrest and subsequent events, it is also premature for the Court to determine the merits of Defendant Troy's cross-claim for indemnification/contribution.

**\*15** Accordingly, the Court denies both Defendant THA's motion for summary judgment on Defendant Troy's cross-claim and Defendant Troy's motion for summary judgment on its cross-claim.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby **ORDERS** that Defendant Troy's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Defendant THA's motion for summary judgment is **GRANTED in part** and **DENIED in part;**[FN19] and the Court further

> [FN19.] As a result of this Memorandum–Decision and Order, the only remaining claims are (1) Plaintiff's unlawful search claims against Defendants Stocklas and McLaughlin under federal and New York law; (2) Plaintiff's excessive force claim against Defendant McLaughlin under federal and New York law; (3) Plaintiff's false arrest/unlawful seizure claims against Defendants Stocklas and McLaughlin under federal and New York State law; and (4) Plaintiff's *Monell* claim

**ORDERS** that Plaintiff shall inform the Court in writing within **ten days** of this Memorandum–Decision and Order whether he has complied with New York General Municipal Law's Notice of Claim requirement with regard to his state-law claims; and, if so, he shall file a copy of that Notice of Claim; and the Court further

**ORDERS** that, if Plaintiff fails to file the necessary documents to demonstrate that he has complied with the Notice of Claim requirement within the required time frame, the Court will dismiss the remaining pendent state-law claims; and the Court further

**ORDERS** that Plaintiff's counsel shall initiate a telephone conference, using a professional telephone conferencing service, with the Court and opposing counsel on **Tuesday, April 12, 2011, at 9:45 a.m.,** to schedule the trial of this matter.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Dukes v. Troy Housing Authority
Slip Copy, 2011 WL 1261317 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Levon SMITH, Plaintiff,
v.
The CITY OF NEW YORK, Police Officer Jorge
Tobon, Shield # 29637 Police Officer Heribert
Bermudez, Shield # 30246, Detective James South,
Shield # 06130, and "John Doe # s 1 through 5" (being
unidentified police officers who were with Detective
South when plaintiff's shop located at 2 East 116th
Street, New York, New York, was padlocked on or
about May 23, 2003), Defendants.
No. 04 Civ. 3286(TPG).

Aug. 27, 2010.
West KeySummary**Civil Rights 78** 🔑 **1088(4)**

78 Civil Rights

 78I Rights Protected and Discrimination Prohibited in
General

  78k1088 Police, Investigative, or Law
Enforcement Activities

   78k1088(4) k. Arrest and Detention. Most Cited
Cases

 Arrestee was not subjected to excessive force in being
handcuffed, precluding recovery in his § 1983 action
against city. Arrestee was arrested after being observed
engaging in a drug sale. An officer handcuffed the
arrestee's hands behind his back. Arrestee alleged that the
handcuffs were too tight and that they exerted slight
pressure on his wrists and were irritating. Additionally,
arrestee alleged that he had numbness in his wrists and the
handcuffs left red rings around his wrists. Arrestee did not
seek medical attention or complain to the police about
injuries from the handcuffing, because after the handcuffs
were removed he was not in pain anymore. U.S.C.A.
Const.Amend. 4.

*OPINION*

THOMAS P. GRIESA, District Judge.

 **\*1** Plaintiff brings a federal civil rights action
pursuant to 42 U.S .C. § 1983 on the basis of three
separate incidents, alleging that he was subjected to
unlawful search and seizure, false arrest, false
imprisonment, excessive force, and malicious prosecution,
and that his place of business was unlawfully searched and
seized. Plaintiff also brings causes of action for assault
and battery, malicious prosecution, conversion, and
trespass pursuant to New York state law.

 Defendants now move for partial summary judgment
pursuant to Fed.R.Civ.P. 56 with respect to all claims
arising from the incidents on June 25, 2002 and May 23,
2003. Plaintiff cross-moves for partial summary judgment
on liability for the incident on March 19, 2003.

 Defendants' motion is granted. Plaintiff's motion is
denied.

*Background*

 The following facts are undisputed unless otherwise
noted.
*June 25, 2002 Incident*

 Plaintiff Levon Smith was the owner of a business
located at 2 East 116th Street in Harlem which fixed flat
tires and sold new and used tires. Prior to June 25, 2002,
there had been a number of drug-related arrests in the
vicinity of the tire shop. Smith Dep. at 63–65.

 According to defendants, on June 25, 2002, defendant
Heriberto Bermudez [FN1] was part of a Street Narcotics
Enforcement Unit ("SNEU") assigned to the 25th precinct
in Harlem. Defendant Jorge Tobon was part of Bermudez's
team, but defendant James South was not. Bermudez was
assigned to an observation post in a building across the
street from plaintiff's tire shop.

  FN1. The caption lists defendant's first name as
  "Heribert," but all the moving papers list it as
  "Heriberto."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

It should be noted that Smith denies that Bermudez was present at the scene, or that he personally observed the events on the street in front of the tire shop which led to Smith's apprehension. As evidence, Smith cites the facts that: (1) Bermudez and Smith did not personally meet until after Smith's arrival at the 25th Precinct; (2) Bermudez claims to have seen three officers arrest Smith, while Smith says he was arrested by only two; and (3) in earlier testimony Bermudez stated that he had witnessed an exchange of cash for cocaine, but in later testimony he stated that he did not see exactly what plaintiff gave the suspected buyer. Plaintiff's 56.1 Statement ¶¶ 4–5.

At approximately 12:40 p.m., according to defendants, Bermudez was conducting surveillance when plaintiff, who was standing outside of his place of business, was approached by an individual later learned to be Jack Blenhyne. Plaintiff and Blenhyne engaged in a brief conversation, lasting approximately two minutes. Following the conversation, according to Bermudez, Blenhyne handed money to plaintiff and in return plaintiff handed an object to Blenhyne. Bermudez Dep. at 15.

Plaintiff denies that Blenhyne handed him any money, stating that instead it was he who handed two dollars to Blenhyne to purchase a drill bit which was needed in the tire shop. Smith Dep. at 72. Plaintiff also denies handing anything else to Blenhyne. *Id.* at 73.

**\*2** According to defendants, after witnessing what appeared, based on his experience, to be a drug transaction, Bermudez provided his field team with a physical description of Blenhyne and plaintiff by radio. Bermudez Dep. at 16–18. Thereafter, Blenhyne was stopped by members of the SNEU team, who recovered eighty clear bags of cocaine from him. Thereafter, officers of the SNEU team, including Tobon, apprehended plaintiff outside of his tire shop. Defendants assert that the officers recovered one bag of cocaine from inside of plaintiff's shop. Bermudez Memo Book, Smith–Williams Decl., Exh. C; Property Clerk's Invoice No. L291493, Smith–Williams Decl., Exh. D. Plaintiff denies that cocaine was recovered from inside his shop, but does not attempt to explain defendants' evidence to the contrary.

During his apprehension, plaintiff was handcuffed. In

order to handcuff him, an officer "grabbed one arm, put it behind my back, handcuffed it, grabbed the other arm, put it behind my back and handcuffed me." Smith Dep. at 87. Plaintiff asked the officers to loosen the handcuffs because they were "extremely tight and painful" but they ignored his requests. *Id.* at 89–90. Plaintiff described the tight handcuffs as placing "slight pressure" on his wrists, like "something squeezing you," *Id.* at 89, and stated that the handcuffs were "slightly painful, very irritating." *Id.* at 90. Plaintiff also testified as to numbness in his wrists, but not in his fingers or hands. *Id.* at 94.

After plaintiff's arrest, Tobon and his partner drove him around in their van for several hours before taking him to the 25th Precinct. *Id.* at 93, 95–96. The officers did not pick up anyone else during those several hours, and plaintiff was handcuffed the entire time. *Id.* at 93–94.

Plaintiff's only alleged injury from the handcuffing is what he described as "red rings" around his wrists once the handcuffs were removed, lasting less than a day. *Id.* at 90, 95. Plaintiff did not request medical attention for his injuries while he was in the custody of the New York City Police Department ("NYPD"), nor did he seek medical treatment after he was released. *Id.* at 96–97, 109–10.

Plaintiff was charged with criminal sale of a controlled substance in the third degree, N.Y. Penal Law § 220.39(1), criminal sale of a controlled substance in the second degree, N.Y. Penal Law § 220.41(1), and criminal possession of a controlled substance in the third degree, N.Y. Penal Law § 220.16(1). A grand jury was convened, at which Bermudez provided testimony. Bermudez Dep. at 26. On or about July 1, 2002, the Grand Jury dismissed the criminal charges against plaintiff.

*March 19, 2003 Incident*

On March 19, 2003, Tobon arrested plaintiff for unlicensed operation of a motor vehicle. Smith Dep. at 145–47; Tobon Dep. at 19–20. Plaintiff testified at his deposition that the vehicle was not double-parked, he was sitting in the passenger seat at the time, and the key was not in the ignition. Smith Dep. at 146–47.

**\*3** Defendants dispute this version of events, asserting that Tobon observed plaintiff's car double-parked on the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

street and that plaintiff was sitting behind the wheel on the driver's side, with the key in the ignition and the engine running. Tobon Dep. at 31; Misdemeanor Complaint in *People v. Levon Smith,* Smith–Williams Reply Decl., Exh. F.

Plaintiff was charged in criminal court with Aggravated Unlicensed Operation in the Third Degree, VTL511(1)(a), and Unlicensed Driving, VTL509(1). *Id.* Plaintiff was released on his own recognizance, and made several court appearances on account of his arrest, but the case against him was eventually dismissed. Smith Dep. at 157–59.

*May 23, 2003 Incident*

In March 2003 and again in May 2003, a confidential informant working with the NYPD entered plaintiff's shop and purchased a few bags of what was purported to be cocaine. Affidavit in Support of Search Warrant, Smith–Williams Decl., Exh. G. At the time of purchase, the bags were retrieved from a container atop a shelf behind a counter in the tire shop, an area not accessible to the general public. *Id.* A short time after each purchase, Detective William Kern field-tested the substance purchased and confirmed that it was cocaine. *Id.;* Kern Dep. at 12–14.

It should be noted that plaintiff denies that cocaine was ever in his shop, arguing that the confidential informant rarely provided reliable information and did not make any sworn statement to the police, and that Kern did not personally observe either of the controlled buys. Plaintiff's 56.1 Statement ¶¶ 36–42.

Based on information received from the confidential informant and the two purchases of cocaine from plaintiff's business premises, Detective Kern submitted an affidavit in support of a search warrant for the tire shop. Smith–Williams Decl., Exh. G. On or about May 15, 2003, Judge William Harrington of the New York County Criminal Court issued a search warrant for plaintiff's place of business. Smith–Williams Decl., Exh. H. It should be noted that while plaintiff does not dispute that such a search warrant was issued, he does dispute its validity.

On May 23, 2003, a team of NYPD officers,

including defendant James South, entered and searched plaintiff's place of business pursuant to the search warrant. South Dep. (Apr. 29, 2009) at 13–14. Plaintiff was out of town at the time, but an employee, Andrew Jones, was present. Jones Dep. at 44. During the search, South discovered plastic wrappers containing cocaine inside a false wall in the bathroom of the tire shop. South Dep. (Apr. 29, 2009) at 27, 68; South Dep. (Sep. 3, 2009) at 4–6; Smith–Williams Decl., Exhs. J, K. Jones was arrested and, at the conclusion of the search, the tire store was padlocked. South Dep. (Apr. 29, 2009) at 28.

The police informed plaintiff that the shop was locked to prevent anyone other than plaintiff from entering the premises after the search. Smith Dep. at 178–79. However, the padlock used by the officers to lock the shop did not belong to plaintiff. Plaintiff had no way to reopen the store and asserts that he was forced to go to the New York County Supreme Court to seek reentry after the police initially denied they had even entered the premises.

**\*4** Defendants counter that no documentation was placed on the premises indicating that plaintiff could not reenter his business. South Dep. (Apr. 29, 2009) at 34–35. Plaintiff did not enter on the advice of counsel, because he was unsure whether it was "legal" to do so. Smith Dep. at 180–81. Nonetheless, sometime in late June or early July 2003, subsequent to the filing of an order to show cause in the New York County Supreme Court, Smith personally removed the padlock from the tire shop and reentered. Smith Decl. ¶ 3.

Plaintiff asserts that when he reopened the tire shop a month or more after the search, he personally examined the contents and took an inventory. In the course of his examination, plaintiff discovered "some damage to some of my equipment and the walls and bathroom of the tire shop. Specifically, there was damage to my air compressor, a jack and the wheel balancing machine. Some of my brand new tire rims were either cracked or bent out of shape which made them useless." Smith Decl. ¶¶ 5–6.

Defendants, citing Jones's testimony, contend that defendant South broke neither equipment nor tools in plaintiff's shop during the course of the search. Jones Dep.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

at 74–76. Plaintiff points out that Jones was arrested and driven away from the shop before the officers completed their search and was not the first to reenter, and therefore cannot testify completely as to the damage sustained. *See* Jones Dep. at 57.

It is undisputed that defendant Bermudez was neither present nor personally involved in the execution of the search warrant at plaintiff's place of business on May 23, 2003. South Dep. (Apr. 29, 2009) at 74; Search Warrant Pre–Execution Plan, Smith–Williams Decl., Exh. I.

Defendants assert that Tobon too was neither present nor personally involved in the execution of the search warrant. *See* South Dep. (Apr. 29, 2009) at 73–74; Search Warrant Pre–Execution Plan, Smith–Williams Decl., Exh. I. Plaintiff, however, submits a declaration from Johnetta Smith, his wife, stating that she saw Tobon in street clothes in front of the tire shop on May 23, 2003, following the arrest of Andrew Jones. She knew Tobon because she had met him at the 25th Precinct in June 2002 when Smith was arrested. Johnetta Smith Decl. ¶¶ 4–5.

Plaintiff also notes that South acknowledged in his Search Warrant Pre–Execution Plan that there was to be an undercover officer present at the execution of the search warrant, identified only as "U/C 7574." Smith–Williams Decl., Exh. I; *see also* South Dep. (Apr. 29, 2009) at 54. Further, South testified that he did not know Tobon. *Id.* at 5. Plaintiff therefore speculates that the undercover officer present on May 23, 2003 was Tobon.

*The Instant Action*

Plaintiff Levon Smith now brings a federal civil rights action pursuant to 42 U.S.C. § 1983 against defendants City of New York, Jorge Tobon, Heriberto Bermudez, James South, and five unidentified "John Doe" police officers on the basis of these three incidents.

**\*5** With respect to the June 25, 2002 incident, plaintiff alleges that:

(1) Defendants violated plaintiff's Fourth Amendment rights by unlawful seizure of his person and the use of excessive force;

(2) Defendants prosecuted plaintiff for a drug transaction that never took place, with malice and without reasonable or probable cause to believe that plaintiff was guilty;

(3) Defendants committed common law assault and battery by intentionally placing handcuffs too tightly on plaintiff;

(4) Defendants falsely arrested plaintiff, with no reasonable or probable cause to believe that he had committed any crime;

(5) Defendants converted plaintiff's property by confiscating plaintiff's cell phone and approximately $80 at the station house and never returning them.

With respect to the March 19, 2003 incident, plaintiff alleges that:

(1) Defendant Tobon violated plaintiff's Fourth Amendment rights by arresting plaintiff and taking his license and registration without reasonable or probable cause;

(2) Defendants criminally prosecuted plaintiff on the basis of a false accusation, with malice and without reasonable or probable cause to believe that plaintiff was guilty.

With respect to the May 23, 2003 incident, plaintiff alleges that:

(1) Defendant South, acting in concert with Tobon and the John Doe defendants, committed unlawful search and seizure by conducting a warrantless [FN2] search of plaintiff's business, destroying property therein, and padlocking the property thereafter;

> FN2. The complaint asserts that this search was conducted without a warrant, but plaintiff now appears to argue only that the warrant was invalid due to lack of probable cause. *See* Section II.A below.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

(2) Defendants committed common law trespass and conversion of plaintiff's property by searching plaintiff's business without his consent and damaging and removing some of its contents.

Plaintiff seeks compensatory damages in the amount of $50 million and punitive damages in the amount of $10 million.

Defendants now move for partial summary judgment pursuant to Fed.R.Civ.P. 56 with respect to the June 25, 2002 and May 23, 2003 incidents on the grounds that: (1) probable cause existed for plaintiff's arrest on June 25, 2002 and therefore plaintiff's false arrest claim should be dismissed; (2) plaintiff's claim for malicious prosecution relating to his June 25, 2002 arrest fails because he cannot satisfy the requisite elements; (3) defendants entered plaintiff's place of business on May 23, 2003 pursuant to a valid search warrant and therefore plaintiff's Fourth Amendment unlawful search and seizure claim should be dismissed; (4) plaintiff's excessive force claim fails as a matter of law; (5) defendants are entitled to qualified immunity; (6) plaintiff cannot establish a claim for municipal liability against the City of New York; and (7) plaintiff's state law claims should be dismissed due to the absence of any viable federal claims and/or due to a failure to satisfy the conditions precedent to suit. Defendants do not move for summary judgment on plaintiff's claims stemming from the March 19, 2003 incident.

Plaintiff cross-moves for partial summary judgment with respect to liability as to the March 19, 2003 unlawful search and seizure and malicious prosecution claims.

### Legal Standard

**\*6** Summary judgment may be granted if there is no genuine issue as to any material fact, such that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making the

summary judgment determination, the court must draw all justifiable inferences in favor of the non-movant. Id. at 255. However, the non-movant is obligated to "set out specific facts showing a genuine issue for trial," and "may not rely merely on allegations or denials" to support its opposition to the motion. Fed.R.Civ.P. 56(e)(2).

### DISCUSSION

### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I. *Federal Claims with respect to the June 25, 2002 Incident*

A. *False Arrest*

The Second Circuit has held that a Section 1983 claim for false arrest, resting on the Fourth Amendment right to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d. Cir.1996). In order to state a claim for false arrest under New York law, plaintiff must prove all of the following four elements: (1) the defendants intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d. Cir.1995); *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). Defendants argue that, for the purposes of this motion, even if plaintiff satisfied the first three prongs, his claim for false arrest must fail because his confinement was privileged.

The presence of probable cause is a complete defense to an action for false arrest whether under Section 1983 or state law. *Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999); *Morel v. Crimaldi,* 256 A.D.2d 188, 683 N.Y.S.2d 22, 24 (N.Y.App.Div. 1st Dept.1998). To determine whether an officer had probable cause to arrest an individual, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quotations and citations omitted).

Courts in this circuit have routinely found probable cause where an officer arrests an individual whom the officer believes, based on his or her own observation, engaged in a hand-to-hand drug sale. *See, e.g., United*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

States v. Washington, 02 Cr. 1574(LTS), 2003 WL 21250681 (S.D.N.Y. May 29, 2003) (probable cause to arrest where officer observed arrestee engage in suspected drug transaction in drug-prone neighborhood and narcotics were subsequently recovered from alleged buyer); Sam v. Brown, 2002 WL 31102644 (E.D.N.Y. September 10, 2002) (probable cause to arrest even though arrestee was not in possession of drugs at time of arrest where officer observed arrestee exchange small object for money with an alleged buyer, and the buyer was later found to be in possession of drugs).

1. *Defendant Bermudez*

a. *Presence at the Scene of the Sale*

**\*7** On the date of arrest, according to defendants, Bermudez was assigned to an observation post in a building across the street from plaintiff's business. Plaintiff, however, argues that Bermudez was in fact *not present* in the vicinity of the tire shop on that day and therefore could not have observed any transaction between Smith and Blenhyne.

Summary judgment should only be granted if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c)(2). A fact is *material* only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, it was the observations of Bermudez which led directly to plaintiff's arrest. If Bermudez was actually not present to witness the purported drug deal, that could affect the determination of probable cause and thereby the outcome of the suit. Therefore there is a dispute here about a material fact.

A dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Here, defendants present as evidence of Bermudez's presence: (1) the Arrest Report of Levon Smith, Smith–Williams Decl., Exh. B; (2) Bermudez's Memo Book, Smith–Williams Decl., Exh. C; and (3) Bermudez's own lengthy and detailed deposition. Plaintiff presents as evidence of Bermudez's absence the facts that: (1) Bermudez and Smith did not personally meet until after Smith's arrival at the 25th Precinct; (2) Bermudez

witnessed three officers arrest Smith, while Smith asserts he was arrested by only two; and (3) in the criminal court complaint Bermudez stated that he had witnessed an exchange of cash for cocaine, but in his deposition he testified that he did not see exactly what plaintiff gave Blenhyne in return for the cash. Based on the above evidence, and drawing all reasonable inferences in the non-movant's favor, it does not appear that a reasonable jury could conclude that Bermudez was not present with the team of officers conducting surveillance near plaintiff's shop. Therefore, there is no genuine issue as to the material fact of Bermudez's presence, and summary judgment is not barred.

b. *Probable Cause to Arrest*

Defendants argue that there was probable cause to arrest plaintiff on June 25, 2002 based on Bermudez's observation of what appeared to be a drug sale by plaintiff in a high-crime area.

Plaintiff was arrested as a direct result of Bermudez's observation and the subsequent discovery of cocaine in the possession of the suspected buyer, Blenhyne. Plaintiff makes much of the fact that the object Bermudez saw plaintiff hand Blenhyne was smaller than the eighty clear bags that were later recovered, and that plaintiff had only $90 on him at the time of his arrest, which is presumably less than the price of such an amount of drugs. However, what is material here is that Bermudez believed, based on observation and experience, that a drug transaction had taken place, and that the suspected buyer was found to be in possession of a significant amount of cocaine moments later.

**\*8** As noted above, courts in this circuit have routinely found probable cause to arrest when the officer believes, based on his or her own observation and experience, that an individual was engaged in a hand-to-hand drug sale. In conjunction with the subsequent discovery of cocaine on the suspected buyer, there was clearly probable cause for arrest in this instance, and because probable cause is a complete defense to a false arrest claim under Section 1983, *see Covington,* 171 F.3d at 122, the false arrest claim against Bermudez is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

2. *Defendant Tobon and the Five John Doe Officers*

The Second Circuit has held that "for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' " *Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003) (quoting *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)).

Here, Bermudez, Tobon, and the five John Doe officers were members of the same narcotics team conducting surveillance in the area surrounding plaintiff's shop. Bermudez witnessed what he believed to be a drug sale, and this knowledge is imputed to Tobon and the five John Doe officers. As noted above, this knowledge, in conjunction with the recovery of drugs from the alleged purchaser, is sufficient to establish probable cause.

Because probable cause is a complete defense to a false arrest action, plaintiff's claim for false arrest against defendant Tobon and the five John Doe officers is also dismissed.

3. *Defendant South*

It is well settled that personal involvement is a prerequisite to liability under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Here, it is undisputed that defendant South was not personally involved in plaintiff's arrest on June 25, 2002. Accordingly, plaintiff does not have a viable false arrest claim against South.

B. *Malicious Prosecution*

In order to state a claim for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997) (quotations and citations omitted). It is recognized that a heavy burden is placed on malicious prosecution plaintiffs. *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004).

1. *Initiation of a Criminal Proceeding*

A criminal proceeding was initiated against plaintiff following his June 25, 2002 arrest. However, this proceeding was initiated not by defendants, but by the New York County District Attorney's Office. In *Alcantara v. City of New York,* 646 F.Supp.2d 449, 459 (S.D.N.Y.2009), the court noted that "once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *See also Rohman v. New York City Transit Auth.,* 215 F.3d 208, 217 (2d Cir.2000) ("[o]ne who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding").

**\*9** In the present case, an Assistant District Attorney ("ADA") independently determined to prosecute plaintiff. Nothing in the record suggests that Tobon discussed the arrest with an ADA, or that he testified before the grand jury. Bermudez's only involvement in the prosecution was relaying to the ADA his observations and the facts known to him regarding plaintiff's arrest and testifying before the grand jury. The District Attorney's office could have declined to prosecute, but made the independent determination that there was reason to go forward, and that Bermudez's testimony was necessary. Accordingly, plaintiff cannot establish that anyone other than the New York County District Attorney's Office, which is not a party to this action, initiated the prosecution against him.

2. *Probable Cause*

A finding of probable cause defeats a malicious prosecution claim. *See Moore v. Comesanas,* 32 F.3d 670, 673 (2d Cir.1994). Once probable cause to arrest is established, a claim for malicious prosecution is barred "unless plaintiff can demonstrate that at some point subsequent to the arrest, additional facts came to light that negated probable cause." *Dukes v. City of New York,* 879 F.Supp. 335, 342 (S.D.N.Y.1995) (citing *Oakley v. Rochester,* 71 A.D.2d 15, 421 N.Y.S.2d 472 (4th Dep't 1979)). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003) (citing *Colon v. City of*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)).

As set forth above, there was probable cause to arrest plaintiff based on Bermudez's observation of what he perceived, based on experience, to be a drug sale and the subsequent recovery of drugs from the suspected buyer. Plaintiff has presented no facts which came to light subsequent to the arrest that would negate probable cause. Furthermore, based on these facts, a reasonably prudent person would likely believe the plaintiff to be guilty. As such, there was probable cause to prosecute.

### 3. Malice

New York law requires the plaintiff to establish that the defendants commenced the criminal proceeding due to a wrong or improper motive, meaning something other than a desire to see the ends of justice served. Rounseville v. Zahl, 13 F.3d 625, 630 (2d Cir.1994). Further, malice may only be inferred where probable cause to initiate a proceeding is "totally lacking." Sulkowska v. City of New York, 129 F.Supp.2d 274, 295 (S.D.N.Y.2001).

Here, plaintiff presents no evidence that defendants Bermudez and Tobon commenced the criminal proceeding in the first place, let alone commenced it due to a wrong or improper motive. Furthermore, as noted above, there was probable cause for both the arrest and the prosecution of plaintiff, and accordingly, malice may not be inferred.

### 4. Summary Judgment on Malicious Prosecution Claim

**\*10** Of the four elements required to state a claim for malicious prosecution, Smith can establish only one—the termination of the proceeding in plaintiff's favor. Therefore, defendants are granted summary judgment on plaintiff's claim for malicious prosecution.

### C. Excessive Force

Plaintiff alleges a claim for excessive force, asserting that defendant Tobon applied handcuffs to his wrists too tightly when he was arrested on June 25, 2002. Compl. ¶ 41. Plaintiff does not allege that anyone other than Tobon used excessive force against him. Id. ¶ 22.

In order for an excessive force claim to rise to the level of a constitutional violation cognizable pursuant to § 1983, the plaintiff must show that the force used was objectively unreasonable under the Fourth Amendment. Richardson v. New York City Health and Hospitals Corp., 05 Civ. 6278(RJS), 2009 WL 804096, at *10 (S.D.N.Y. Mar. 25, 2009) (citing Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In determining the reasonableness of an officer's actions, the court must apply a balancing test that measures the intrusion on the individual's Fourth Amendment interests against the government's interests. Id. at 396. The reasonableness determination cannot be made in hindsight, but must be judged from the officer's perspective in the heat of the moment. Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by Pearson v. Callahan, —— U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Supreme Court has recognized that the effectuation of a custodial arrest "necessarily carries with it the right to use some degree of physical coercion ...." Graham, 490 U.S. at 396.

In evaluating the reasonableness of a tight handcuffing claim, the court should consider whether: "1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Esmont v. City of New York, 371 F.Supp.2d 202, 215 (E.D.N.Y.2005). Where an arrestee suffers de minimis injuries, summary judgment is appropriate. Id. Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity. See, e.g., Richardson, 2009 WL 804096 (short-term pain, swelling, and bruising does not amount to excessive force); Hamlett v. Town of Greenburgh, 2007 WL 119291 (S.D.N.Y. Jan.17, 2007) (brief numbness from tight handcuffing insufficient to establish excessive force); Vogeler v. Colbath, 2005 WL 2482549 (S.D.N.Y. Oct.6, 2005) (claims of minor discomfort from handcuffing not actionable).

Here, plaintiff testified that during his arrest, in accordance with Tobon's instruction, plaintiff placed his hands against a police van and Tobon "grabbed one arm, put it behind my back, handcuffed it, grabbed the other arm, put it behind my back and handcuffed me." Smith Dep. at 87. Plaintiff testified that it took approximately one minute for Tobon to handcuff him. Id. at 88.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

*11 Plaintiff testified that he asked the officers to loosen the handcuffs because they were "extremely tight and painful," but they ignored his requests. However, when questioned at the deposition as to exactly what he felt, plaintiff described experiencing "slight pressure" on his wrists, like "something squeezing you," *id.* at 89, and stated that the handcuffs were "slightly painful, very irritating." *Id.* at 90. Plaintiff did testify as to numbness in his wrists, but not in his fingers or hands. *Id.* at 94. A handcuffing cannot be expected to be comfortable, and there is nothing in plaintiff's testimony to suggest that this particular handcuffing was unreasonably tight. *See Grant v. City of New York,* 500 F.Supp.2d 211, 217 (S.D.N.Y.2007) ("Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out.").

Further, plaintiff's only alleged injury from the handcuffing is what he described as "red rings" around his wrists once the handcuffs were removed. Smith Dep. at 90, 95. Plaintiff stated that these lasted less than a day. *Id.* at 95. Plaintiff never asked defendants Bermudez or Tobon, or any other NYPD officer, to obtain medical treatment for him. *Id.* at 96–97, 109–110. He testified that he did not request medical attention while in the prisoner van because "[i]t didn't appear to be at that point where I think I needed medical assistance ...." *Id.* at 97. Further, plaintiff did not complain about his alleged injuries during a routine medical screening at the Manhattan Detention Center because he "wasn't in pain anymore." *Id.* at 109. Plaintiff also testified that he saw a private doctor in July 2002 following his release from prison and did not complain about any injuries at that time either. *Id.* at 108, 109–10.

Therefore, under the framework for evaluating the reasonableness of a tight handcuffing claim, as laid out in *Esmont,* 371 F.Supp.2d at 215, it does not appear from plaintiff's own testimony that the handcuffs were unreasonably tight, and plaintiff's injuries were clearly *de minimis.* Further, it appears that the force used by Tobon was objectively reasonable under the circumstances. *See Graham,* 490 U.S. at 397. Accordingly, defendants are granted summary judgment on the claim for excessive force.

II. *Federal Claims with respect to the May 23, 2003 Incident*

Plaintiff alleges that, on or about May 23, 2003, his place of business was unlawfully searched and seized in violation of the Fourth Amendment. *See* Compl. ¶¶ 77–80. Plaintiff also alleges that the search of his business was conducted in an unduly destructive manner. *See* Compl. ¶ 38.

The only defendant undisputedly present at plaintiff's place of business on May 23, 2003 and involved in the search was defendant South. South Dep. at 73–74. Since Bermudez was not personally involved in the search, plaintiff cannot maintain a claim against him for the alleged unlawful search and seizure of his business, or for the allegedly destructive search. *Wright,* 21 F.3d at 501. Tobon's presence on May 23, 2003 is disputed. *See* Decl. of Johnetta Smith.

A. *Unlawful Search*

*12 Plaintiff's unlawful search claim appears to have been based initially on the misconception that defendants did not obtain a warrant before searching the tire shop. *See* Compl. ¶ 77. However, it is clear from the evidence that defendants did, in fact, have a search warrant authorizing the entry into and search of plaintiff's business. Search Warrant, Smith–Williams Decl., Exh. H. Apparently recognizing this, plaintiff argues for the first time in his memo in opposition that defendants have failed to demonstrate that the confidential informant on whose information they relied to obtain the search warrant was reliable. There are a number of flaws in this line of argument.

First, plaintiff has failed to fulfill the requirements of Fed.R.Civ.P. 8(a)(2), providing that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief ...." Here, plaintiff neglected to plead in his complaint any facts at all related to this claim, providing defendants no notice that plaintiff intended to challenge the validity of the warrant.

Second, plaintiff's contention that defendants are obligated to demonstrate that the search warrant was obtained upon reliable information is incorrect. Plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

only support for this argument is an overruled Supreme Court case, *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *overruled by Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The applicable case law establishes that, on the contrary, there is a presumption of validity with respect to the affidavit supporting a search warrant. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A plaintiff challenging the validity of a search warrant faces a heavy burden and must demonstrate that "the officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause." *Spares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993) (internal quotations and citations omitted). Plaintiff here makes no such allegations and has therefore failed to overcome the presumptive validity of the affidavit and thus the search warrant in this case.

B. *Unlawful Seizure*

The Fourth Amendment reads, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV.

Plaintiff here alleges that defendants unlawfully seized his business between May 23 and June 12, 2003. Compl. ¶¶ 78–79. Specifically, plaintiff alleges that NYPD officers padlocked his shop following the search on May 23, 2003, and that as a result, he was unable to enter or transact any business there until after he filed an order to show cause in state court. *Id.* ¶¶ 77–80.

However, plaintiff testified that when he inquired, the NYPD explicitly indicated that the business was only padlocked for security reasons, in order to prevent anyone *other than* plaintiff from entering the premises after the search. Smith Dep. at 178–79. In addition, plaintiff testified that he did not enter his shop following the May 23, 2003 search not because there was any indication from the NYPD that he could not, but because he himself did not know whether it was "legal" to enter and because he was advised by his counsel not to do so. *Id.* at 180–81. As such, it seems that any "seizure" here was merely a result

of plaintiff's uncertainty as to whether he was permitted to reenter following the search.

C. *Unduly Destructive Search*

**\*13** Plaintiff alleges that his place of business was searched in an unduly destructive manner. Compl. ¶ 38, 77. "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful ...." *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). However, "it is well recognized that 'officers executing search warrants on occasion must damage property in order to perform their duty.' " *Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995) (quoting *Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979)). Further, "[b]efore any due process liability can be imposed for property damage occurring in a lawful search, it must be established that the police acted unreasonably or maliciously in bringing about the damage." *Cody,* 59 F.3d at 16.

In support of his claim that his business was searched in an unduly destructive manner, plaintiff relies partly on the deposition of his employee, Andrew Jones, who was present during the search. Specifically, plaintiff points to Jones's description of the actions of the police as "knocking over everything," "tearing it up," and "wrecking it." However, when specifically asked during his deposition in what manner the officers were "tearing up" the place, Jones responded: "Knocking down the tires. Knocking over the chairs. Things of that nature. That's all I remember." Jones Dep. at 51. Jones's testimony does not paint a picture of an unduly destructive search. Plaintiff himself testified that, upon his return to the shop, he discovered damage to "some of my equipment and the walls and bathroom of the tire shop. Specifically, there was damage to my air compressor, a jack and the wheel balancing machine. Some of my brand new tire rims were either cracked or bent out of shape which made them useless." Smith Decl. ¶¶ 5–6.

As noted above, the lawful execution of a search warrant may entail a certain degree of damage. *Dalia,* 441 U.S. at 258. Here, plaintiff has not produced any documentary evidence to support his allegations that the officers broke his tools and machines. He has not provided

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

any photos of broken tools or any bills or receipts to document any repairs. On a motion for summary judgment, the court must draw all justifiable inferences in favor of the non-movant. However, the non-movant is obligated to "set out specific facts showing a genuine issue for trial," and "may not rely merely on allegations or denials" to support its opposition to the motion. Fed.R.Civ.P. 56(e)(2). Here, plaintiff relies entirely on allegations, and thus fails to demonstrate a genuine issue for trial as to whether defendants acted "unreasonably or maliciously," as required to state a Fourth Amendment claim for property damage occurring in the course of a lawful search. Cody, 59 F.3d at 16. Therefore, defendants are granted summary judgment on this claim.

III. *State Law Claims*

A. *False Arrest, Malicious Prosecution, and Assault and Battery*

**\*14** Because plaintiff's federal claims for false arrest, malicious prosecution, and excessive force are dismissed on summary judgment, as outlined above, to the extent plaintiff brings analogous state law claims, those claims are dismissed as well because the elements are the same.

"The elements of a federal civil rights claim based upon an allegation of false arrest are the same as the elements of a false arrest claim under New York law." *Mason v. Village of Babylon,* 124 F.Supp.2d 807, 814 (E.D.N.Y.2000). Similarly, "[t]he elements of ... malicious prosecution under § 1983 are substantially the same as the elements under New York law. Therefore, the analysis of the state and federal claims is identical." *Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003) (internal quotations and citations omitted). Finally, "the test for whether a plaintiff can maintain a supplemental cause of action for assault and battery is the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Pierre–Antoine v. City of New York,* 04 Civ. 6987(GEL), 2006 WL 1292076, at \*8 (S.D.N.Y. May 9, 2006).

Therefore, for the same reasons plaintiff cannot establish a federal claim for false arrest, malicious prosecution, or excessive force, he cannot establish a state

claim for false arrest, malicious prosecution, or assault and battery.

B. *Conversion and Trespass*

Defendants argue that plaintiff's state law claims for conversion and trespass concerning the alleged seizure of his business on May 23, 2003 must be dismissed because plaintiff failed to comply with the timely filing requirements of New York's General Municipal Law.

New York's General Municipal Law §§ 50–e and 50–i require that a plaintiff asserting state law tort claims against a municipal entity or its employees acting in the scope of employment: (1) file a notice of claim within ninety days after the incident giving rise to the claim, and (2) commence the action within a year and ninety days from the date on which the cause of action accrues. *Id.* In addition, General Municipal Law § 50–i(b) requires that "it shall appear by and as an allegation in the complaint or moving papers that at least thirty days have elapsed since the service of such notice [of claim] and that adjustment or payment thereof has been neglected or refused .... " *Id.*

Plaintiff acknowledges that he missed the filing deadlines under New York law, but notes that he moved the New York County Supreme Court for leave to file a late notice of claim, and that court granted relief. *See* Okoli Decl., Exhs. 24, 25. However, upon closer examination, plaintiff did not apply for, and the court did not grant, relief to file a late notice of claim for conversion and trespass. The court ordered only that "the proposed notice of claim annexed to Petitioner's papers as an exhibit shall be deemed timely served ...." Okoli Decl., Exh. 25. This proposed notice of claim includes only claims for: "False arrest/imprisonment; Unlawful Search and Seizure; Excessive force; Malicious prosecution; Abuse of process; violation of civil and constitutional rights." Okoli Decl., Exh. 24. Therefore, plaintiff never received leave to file a late notice of claim with respect to claims for conversion and trespass.

**\*15** The notice of claim requirements are strictly construed, and a plaintiff's "failure to comply with the mandatory New York statutory notice-of-claim requirements generally results in dismissal of his claims." *Warner v. Village of Goshen Police Dep't.,* 256 F.Supp.2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

171, 175 (S.D.N.Y.2003); *see also Hyde v. Caputo,* 2001 WL 521699, at *4 (E.D.N.Y. May 11, 2001) (quoting *Davidson v. Bronx Municipal Hosp.,* 64 N.Y.2d 59, 62, 484 N.Y.S.2d 533, 473 N.E.2d 761 (1984)).

In the instant case, plaintiff has failed to comply with New York State law because he failed to file a timely notice of claim regarding conversion and trespass with respect to the events of May 23, 2003. The limitations periods under General Municipal Law §§ 50–e and 50–i for this incident expired nearly seven years ago. Therefore, defendants are entitled to summary judgment on the conversion and trespass claims.

**IV.** *Qualified Immunity*

Police officers, like other government officials performing discretionary functions, are shielded from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Therefore, even where a police officer acts *without* probable cause, he may be entitled to qualified immunity if he can demonstrate "arguable probable cause" which exists if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004) (quotations and citations omitted).

**A.** *False Arrest: June 25, 2002*

As noted above, there was probable cause to arrest plaintiff for criminal sale of a controlled substance on June 25, 2002. Defendants argue that even if it were determined that Tobon and Bermudez had acted without probable cause, they would still be entitled to qualified immunity because under the circumstances it was objectively reasonable to believe that probable cause existed.

Here, Officer Bermudez witnessed plaintiff exchange what Bermudez believed was drugs for money. Bermudez Dep. at 13–14. Following the exchange, the alleged purchaser was found to be in possession of cocaine and

was arrested. Thereafter, plaintiff was also arrested. Plaintiff's deposition testimony partially corroborates Bermudez's version of events. Plaintiff confirms that Blenhyne approached him outside of his tire store, that they engaged in a short conversation, and that there was an exchange of money between himself and Blenhyne, following which Blenhyne was arrested for cocaine possession. Smith Dep. at 70–74. Further, plaintiff admits that there had been at least two drug-related arrests in the vicinity of his business prior to his own arrest. *Id.* at 63–64. Based on this set of facts, it was objectively reasonable for Bermudez to believe that plaintiff had in fact engaged in a drug transaction and that probable cause existed to arrest him. Bermudez can thus demonstrate "arguable probable cause" and is therefore entitled to qualified immunity.

**\*16** Detective Tobon is also entitled to qualified immunity for his participation in plaintiff's June 25, 2002 arrest. "[W]here law enforcement authorities are cooperating in an investigation ... the knowledge of one is presumed shared by all." *Andreas,* 463 U.S. at 771 n. 5. Therefore, it was objectively reasonable for Tobon to arrest plaintiff after receiving information, via a radio communication from Bermudez, that plaintiff had engaged in a suspected drug transaction. Tobon can thus demonstrate "arguable probable cause" and is entitled to qualified immunity.

**B.** *Excessive Force: June 25, 2002*

Defendants argue that Tobon is also entitled to qualified immunity from plaintiff's excessive force claim for tight handcuffing. Defendants note that the Second Circuit has stated that there is no constitutional right not to be handcuffed during the course of an arrest. *Soares,* 8 F.3d at 922. Further, defendants argue, it is objectively reasonable for an officer to handcuff an arrestee while effectuating a lawful arrest (citing *Grant,* 500 F.Supp.2d at 217). Here, defendants argue, because plaintiff's arrest was supported by probable cause, it was objectively reasonable to handcuff plaintiff during the course of his arrest, and as such, Tobon is entitled to qualified immunity.

However, the Second Circuit has explicitly rejected this line of argument, holding that "[a]lthough handcuffing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

will be the reasonable course in many, if not most arrest situations, we do not accept the principle that handcuffing is per se reasonable .... In determining whether the force used to effect a particular seizure is reasonable, a court must evaluate the particular circumstances of each case." *Spares,* 8 F.3d at 921.

In evaluating the particular circumstances of this case, it appears, as described more fully above, that the force used by Tobon was objectively reasonable from the officer's perspective in the heat of the moment. *See Graham,* 490 U.S. at 397; *Saucier,* 533 U.S. at 205. Therefore, even if the court were to determine that Tobon acted without probable cause with respect to the force used in arresting plaintiff, Tobon could likely demonstrate "arguable probable cause," and thus qualified immunity. *See Escalera,* 361 F.3d at 743.

C. *Unlawful Search: May 23, 2003*

Here, as noted above, the valid search warrant authorizing the officers to enter and search plaintiff's place of business presumptively established probable cause to do so. Even if plaintiff were able to successfully challenge the validity of the search warrant, and thus probable cause, defendant South would nonetheless be entitled to qualified immunity under a theory of "arguable probable cause."

First, South did not obtain the search warrant, nor was the application for the search warrant submitted by him. Affidavit in Support of Search Warrant, Smith–Williams Decl., Exh. G. The application was submitted by Detective William Kern, who is not a party to this action, based on his own previous experiences and knowledge concerning plaintiff's tire shop. *Id.* Second, South testified that he received the search warrant from his supervising officer, that he reviewed the warrant, and that he entered and searched plaintiff's place of business pursuant to such warrant as he was instructed to do by his supervisor. South Dep. (Apr. 29, 2009) at 7–14. There is no evidence that South had any indication that the warrant was obtained on the basis of falsehoods or incomplete information. In fact, South testified that he never saw the search warrant affidavit. *Id.* at 9. Thus, it was objectively reasonable for South to search plaintiff's place of business pursuant to what he had no reason to doubt was a valid search warrant, and he is entitled to qualified immunity.

V. *Municipal Liability*

**\*17** In order to prevail on a 42 U.S.C. § 1983 claim against a municipality, a plaintiff must show that a municipal policy or custom caused the deprivation of his constitutional rights. *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Sarus v. Rotundo,* 831 F.2d 397, 400 (2d Cir.1987). A municipality may not be held liable under Section 1983 on the basis of *respondeat superior. Monell,* 436 U.S. at 691. Rather, "[t]he plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection—an 'affirmative link—between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Plaintiff has failed to identify any such municipal policy or custom of defendant City of New York, alleging only that "the individual defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the City and State of New York, and under the authority of their office as police officers ." Compl. ¶ 19. Defendants cite to *Dwares v. City of New York,* 985 F.2d 94 (2d Cir.1993) for the proposition that to state a claim for municipal liability under Section 1983, a plaintiff must do more than merely state that a municipal policy or custom exists. *See id.* at 100 ("the mere assertion ... that a municipality has ... a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference ....").

There is some debate as to whether *Dwares* is still good law on this issue following the Supreme Court's opinion in *Leatherman v. Tarrant County,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Some courts in this Circuit have interpreted *Leatherman* as overruling or abrogating *Dwares* only on other grounds. *See, e.g., Cerbelli v. City of New York,* 600 F.Supp.2d 405, 411 (E.D.N.Y.2009); *Leon v. City of New York,* 09 Civ. 8609(WHP), 2010 WL 2927440, \*5 (S.D.N.Y. Jul. 1, 2010). Other courts have interpreted *Leatherman* as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

adopting the Ninth Circuit rule that "a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Karim–Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 624 (9th Cir.1988); *see, e.g., Hughes v. City of Hartford,* 96 F.Supp.2d 114, 116–17 (D.Conn.2000); *Simpkins v. Bellevue Hosp.,* 832 F.Supp. 69, 73–74 (S.D.N.Y.1993). However, even under the liberal pleading standard urged by the second set of cases, plaintiff has failed to state a claim for municipal liability because he fails to allege even that the individual officers' conduct conformed to official policy, custom, or practice.

**\*18** More importantly, plaintiff cannot establish municipal liability on the part of the City because he cannot prove any underlying violation of a constitutional right. As discussed above, plaintiff's constitutional claims fail, as there was probable cause for his arrest and prosecution, he was not subjected to excessive force, and there was a valid search warrant authorizing the entry and search of his business. *See Khan v. Ryan,* 145 F.Supp.2d 280, 285 (E.D.N.Y.2001) ("If there is no underlying constitutional violation by a municipal official, the municipality is not liable [under § 1983]."). Plaintiff has thus failed to plead sufficient facts to state a viable theory of liability with respect to defendant City of New York, and defendants are granted summary judgment on this claim.

### PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff cross-moves for partial summary judgment as to liability with respect to his claims for false arrest [FN3] and malicious prosecution in connection with his March 19, 2003 arrest.

FN3. Plaintiff's complaint asserts a cause of action for unlawful search and seizure of both plaintiff's person and his property in connection with the March 19, 2003 incident. He now moves for summary judgment with respect to the false arrest portion of this claim, but does not appear to move for summary judgment with respect to the unlawful search and seizure of his property. Even if such a motion were made, it would be

denied for the same reasons outlined below.

The parties' versions of events with respect to this incident vary widely. Specifically, plaintiff asserts that he was seated in the passenger seat of his car, which was properly parked in front of the tire shop, that the engine was not running, and that the key was not in the ignition when he was approached by defendant Tobon. Smith Dep. at 146–47. Plaintiff thus alleges that Tobon arrested him for operating a vehicle with a suspended license despite the fact that he was not driving and the engine was not running. Compl. ¶¶ 65, 68–70.

By contrast, Tobon has testified that he approached plaintiff only after he observed his double-parked vehicle, and upon approach discovered plaintiff sitting behind the wheel with the key in the ignition and the engine running. Tobon Dep. at 31; Misdemeanor Complaint, Smith–Williams Reply Decl., Exh. F. A computer check of plaintiff's driver's license revealed that the license was suspended. *Id.* Based on these facts, plaintiff was arrested and charged with aggravated unlicensed operation in the third degree and unlicensed driving. *Id.*

The existence of probable cause is a complete defense to an action for false arrest or malicious prosecution. *Covington,* 171 F.3d at 122; *Murphy,* 118 F.3d at 947. Considering that the parties' accounts are contradictory with respect to a number of facts necessarily underlying the probable cause determination, there are genuine issues of material fact surrounding plaintiff's March 19, 2003 arrest which preclude the granting of summary judgment on these claims.

### Conclusion

For the reasons outlined above, defendants' motion for partial summary judgment is granted and plaintiff's cross-motion for partial summary judgment is denied. This opinion resolves the motions listed as document numbers 19 and 25 in this case.

SO ORDERED.

S.D.N.Y.,2010.

Smith v. City of New York
Not Reported in F.Supp.2d, 2010 WL 3397683

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3397683 (S.D.N.Y.)

(Cite as: 2010 WL 3397683 (S.D.N.Y.))

(S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.